121 Wn.2d 152 (1993)
849 P.2d 1201
WASHINGTON FEDERATION OF STATE EMPLOYEES, COUNCIL 28, AFL-CIO, ET AL, Appellants,
v.
THE OFFICE OF FINANCIAL MANAGEMENT, ET AL, Respondents, INTERNATIONAL FEDERATION OF PROFESSIONAL AND TECHNICAL ENGINEERS, LOCAL 17, AFL-CIO, Appellant.
No. 59445-7.
The Supreme Court of Washington, En Banc.
March 18, 1993.
*154 Swanson, Parr, Cordes, Younglove, Peeples & Wyckoff, P.S., and Douglas P. Wyckoff, for appellants Washington Federation of State Employees, et al.
Richard D. Eadie, for appellant International Federation of Professional and Technical Engineers.
Christine O. Gregoire, Attorney General, and Maureen A. Hart, Division Chief, for respondents.
UTTER, J.
The Washington Federation of State Employees, Council 28, AFL-CIO (WFSE) and the International Federation of Professional and Technical Engineers, Local 17 (Local 17) appeal an order of summary judgment against them in their suit against the Office of Financial Management (OFM). The labor organizations assert OFM unlawfully refused to implement an increase in the salaries of certain classified employees which had been authorized by the Washington State Personnel Board (Board). This court accepted direct review of this case after certification by Division Two of the Court of Appeals pursuant to RCW 2.06.030.

I
On May 10, 1989, the Legislature passed the 1989-1991 biennial operating budget. The budget provided for a 2.5 percent across-the-board salary increase for state employees in 1990, and a similar increase of 6 percent in 1991. See Laws of 1989, 1st Ex. Sess., ch. 19, § 714(1), p. 2969. This budget was approved by Governor Gardner on June 2, 1989. See Laws of 1989, 1st Ex. Sess., ch. 19, § 818, p. 2980.
On May 11, the day after the passage of the budget, the Board held its regular monthly meeting in Olympia. The agenda for this meeting covered a broad range of classification and compensation proposals regarding issues under the Board's jurisdiction. Among the matters on the agenda was a proposal from the Washington Public Employees Association (WPEA) to increase certain state salaries as a means of redressing "extreme salary inequities" between state and private employees. Clerk's Papers, at 721. After considerable *155 discussion, the Board approved a motion by Chairman Richard Kelley to adopt a portion of WPEA's proposal. This motion provided for the increase of the salaries of certain state employees to within 27.5 percent of those obtained in the private sector. Since some of the affected salaries were then lagging 32 percent behind comparable positions in the private sector, the motion had the effect of increasing some state salaries by approximately 5 percent. This "catchup" increase was to take effect on October 1, 1989.
On September 27, 1989, Len McComb, Director of the Office of Financial Management, responded to the decision of the Board to authorize the 5 percent increase. He transmitted a memorandum to Dee Henderson, Director of the Department of Personnel, informing him that, pursuant to its statutory authority, OFM would not implement the 5 percent increase. He also directed Director Henderson that any future Board actions in such matters should be routed through his office prior to notification of any of the affected agencies.
At about the same time, OFM put together a "background summary" concerning its reasons for the disapproval of the "catchup" increase. In this summary, OFM detailed three reasons for not approving the Board's increase. First, as a result of the increase, "the impacted agencies would have to cut back on the delivery of services and programs in order to cover over $2.9 million in increased compensation costs." Clerk's Papers, at 639. Second, the Board "did not have surveys or studies done to document" the need for the salary increase. Clerk's Papers, at 639. And third, OFM "has serious concerns that some employee unions may interpret [the Board's] action as an implicit effort to bypass the Legislature's authority in establishing compensation policy for state employees." Clerk's Papers, at 639.
According to the deposition testimony of Director McComb, this summary of OFM's reasons was not prepared for Director Henderson, but instead for distribution to the Governor's press office and for OFM's communication personnel. *156 It was to be used by these offices in responding to the media reaction which was anticipated following public announcement of the disapproval.
On October 5, 1989, the Board responded by memorandum to Director McComb's announcement of OFM's disapproval.[1] The Board expressed to Director McComb its belief that OFM had exceeded its legal authority by inquiring into the processes by which the Board adopted amendments to the state salary schedule. In essence, the Board alleged OFM's actions constituted an illegitimate attempt to wrest control of the State's salary setting procedure.
On October 11, 1989, WFSE initiated a lawsuit in the Superior Court for Thurston County.[2] WFSE requested both declaratory relief that OFM had acted unlawfully and injunctive relief against the disapproval of the 5 percent "catchup" increase. The union argued that OFM's action in disapproving the "catchup" increase was contrary to law for two reasons. First, OFM had exceeded its statutory authority by considering issues other than "fiscal impact". Second, OFM had engaged in impermissible "piecemeal" alteration of a state salary schedule revision. Local 17 was permitted to take part in the action as plaintiff intervenor and WPEA was permitted to participate as amicus curiae in support of WFSE and Local 17.
The trial court heard cross motions for summary judgment on August 20, 1990. After argument, the court granted summary judgment on behalf of OFM and denied summary judgment for the labor organizations. WFSE and Local 17 appealed to Division Two of the Court of Appeals. The Court of Appeals certified the case to this court and we accepted review on August 10, 1992.

II
[1] In reviewing an appeal of an order of summary judgment, we engage in the same inquiry under CR 56(c) as the *157 trial court. Wilson v. Steinbach, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982); Robinson v. Seattle, 119 Wn.2d 34, 57, 830 P.2d 318, cert. denied, 113 S.Ct. 676 (1992). In doing so, we will affirm a grant of summary judgment only if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Simpson Tacoma Kraft Co. v. Department of Ecology, 119 Wn.2d 640, 646, 835 P.2d 1030 (1992).
Furthermore, while we consider all the facts submitted and make all reasonable inferences from those facts in favor of the nonmoving party, Bohn v. Cody, 119 Wn.2d 357, 362, 832 P.2d 71 (1992), we "will consider only evidence and issues called to the attention of the trial court." RAP 9.12. The purpose of this limitation is to effectuate the rule that the appellate court engages in the same inquiry as the trial court. See, e.g., Southcenter View Condominium Owners' Ass'n v. Condominium Builders, Inc., 47 Wn. App. 767, 736 P.2d 1075 (1986) (factual allegations raised in appellate brief did not preclude summary judgment where unsupported in trial court record), review denied, 107 Wn.2d 1028 (1987).
Legal authority for judicial review of OFM's action is provided for in RCW 34.05.570, which allows for judicial review of agency action that is allegedly "[o]utside the statutory authority of the agency or the authority conferred by a provision of law". RCW 34.05.570(4)(c)(ii). Appellate review of superior court decisions under RCW 34.05.570 is provided for in RCW 34.05.526.

III
State salaries in Washington are established in two separate but closely related procedures. The ordinary procedure is for the Board, OFM, the Governor, and the Legislature to cooperate in incorporating a state salary schedule in the biennial budget. RCW 41.06.150 provides the Board with authority to create and adopt salary and classification plans[3] for state employees. Specifically, the statute authorizes:

*158 (15) Adoption and revision of a comprehensive classification plan for all positions in the classified service, based on investigation and analysis of the duties and responsibilities of each such position;
....
(17) Adoption and revision of a state salary schedule to reflect the prevailing rates in Washington state private industries and other governmental units but the rates in the salary schedules or plans shall be increased if necessary to attain comparable worth under an implementation plan under RCW 41.06.155, such adoption and revision subject to approval by the director of financial management in accordance with the provisions of chapter 43.88 RCW;
(Italics ours.) RCW 41.06.150(15), (17).
After the Board has generated a classification plan and salary schedule pursuant to these statutes, it transmits the plan and schedule to OFM and the Governor. These documents are then considered in the preparation of the Governor's biennial budget proposal to the Legislature. See WAC 356-14-035(1).
Pursuant to its own internal regulations, the Board does not consider "fiscal impact" in adopting the state salary schedule. See WAC 356-14-062. Considerations of cost enter the decision-making process only through the review of the plans by OFM, the state budgetary authority. OFM is authorized by statute to review the plans submitted by the Board for "fiscal impact" and to "amend or alter" those plans if necessary.[4] Specifically, RCW 43.88.160 provides:
(4) In addition, the director of financial management, as agent of the governor, shall:
....
(c) Review any pay and classification plans, and changes thereunder, developed by any agency for their fiscal impact: PROVIDED, That none of the provisions of this subsection shall affect merit systems of personnel management now existing or hereafter established by statute relating to the fixing of qualifications requirements for recruitment, appointment, or promotion of employees of any agency. The director shall advise and confer with agencies including appropriate standing committees *159 of the legislature as may be designated by the speaker of the house and the president of the senate regarding the fiscal impact of such plans and may amend or alter said plans, except that for the following agencies no amendment or alteration of said plans may be made without the approval of the agency concerned: Agencies headed by elective officials;
(Italics ours.) RCW 43.88.160(4)(c) (formerly codified at RCW 43.88.160(1)(c)). Following OFM's "fiscal impact" review, the original or amended plan is incorporated into the Governor's proposed biennial budget and submitted to the Legislature.
OFM therefore performs the important task of ensuring that the state salary schedule is compatible with the financial requirements of the state budget. If the decisions of the Board and other agencies were not subject to "fiscal impact" review, the State's financial stability could be seriously threatened by independent agency action. In granting "fiscal impact" review authority to OFM, the Legislature has recognized that even when agencies like the Board are pursuing their statutory mandate in good faith, there is a need for their actions to be coordinated by the State's budgetary authority with respect to the fiscal resources available. See RCW 43.88.010 (one purpose of RCW 43.88 is to define "fiscal controls as will promote effective budget administration").
In addition, there is a procedure for revising classification plans and salary schedules in the period between the adoption of the biennial budgets. Pursuant to its authority to revise salary plans, the Board has promulgated WAC 356-14-060, which provides:
(1) ... whenever the board or director find it necessary, the director may conduct additional salary surveys and/or alignment studies to determine salaries, or whether salary changes are needed.
....
(3) Salary levels which are indicated by the results of these surveys or studies may be implemented upon approval of the board provided:
(a) The salary is for a new class; or
(b) Substantial changes to duties and responsibilities which affect salary are made to the class; or

*160 (c) Significant salary-related recruiting and/or retention problems exist, as documented in historic records.
WAC 356-14-060.
OFM has the authority to review these interim adjustments to the salary schedules for "fiscal impact" just as it reviews the full biennial plans. RCW 43.88.160(4)(c) gives OFM authority to review both salary and classification plans and "changes thereunder" to those plans. OFM's authority to review these interbudget changes is reflected in the Board's regulations. See WAC 356-14-062.
The 5 percent "catchup" increase at issue in this case was such an interim change to the state salary schedule approved by the Board. The increase was not developed for inclusion in a new budget; in fact, the Legislature had passed a full budget just the day before. As noted earlier, this budget provided for only a 2.5 percent across-the-board increase in state salaries.

IV

A
WFSE first argues OFM exceeded its statutory authority by reviewing the Board's actions for reasons other than "fiscal impact". Relying on the background summary, WFSE contends OFM improperly considered the extent of the Board's research into the salary increase and the possibility that the unions would misinterpret the "catchup" increase as an attempt to evade the authority of the Legislature. WFSE does not claim, however, that fiscal impact did not play some role in OFM's decision. Instead, WFSE argues OFM impermissibly considered factors which are not part of "fiscal impact" review. In essence, this argument amounts to a claim that OFM's decision was unlawful because it was "tainted" by the presence of illegitimate purposes.
[2] The statute permits OFM review of salary schedules for "fiscal impact". Washington law does not require an administrative agency exercising its authority to provide a pure (i.e., "untainted") rationale for its decisions. In Washington Fed'n of State Employees v. State, 99 Wn.2d 878, 665 P.2d 1337 (1983), we were faced with a challenge to OFM's decision *161 in 1982 to shift the state payroll system from a monthly system to a twice-monthly "lagged" system. At the time the decision to make the switch to the "lagged" system was made, then-Governor Spellman publicly issued a letter describing the purpose of the change as revenue enhancement. Washington Fed'n, 99 Wn.2d at 882.
WFSE challenged the "lagged" system in court, arguing that OFM was only permitted to alter the State's payroll system for accounting efficiency purposes, not for revenue enhancement. We rejected this challenge, holding that the possible presence of a revenue raising motive was irrelevant as long as OFM had also been motivated by accounting efficiency. We stated:
Although [OFM] may also have had revenue raising in mind, we need not look to the purity of [its] motives as long as the proper reasons of payroll preparation and accounting efficiency were accomplished.
Washington Fed'n, 99 Wn.2d at 890.
A similar principle has been enunciated in federal case law dealing with the decisions of federal agencies which are based on multiple grounds. Under federal law, the decision of a federal administrative agency will not be reversed if improperly motivated, unless the agency would not have acted but for the improper reasons. Syracuse Peace Coun. v. FCC, 867 F.2d 654, 657 (D.C. Cir.1989), cert. denied, 493 U.S. 1019 (1990); Salt River Project Agricultural Imp. & Power Dist. v. United States, 762 F.2d 1053, 1060 n. 8 (1985). While the Syracuse Peace Council and Salt River cases involved erroneous factfinding by administrative agencies rather than an improper exercise of statutory authority, we find the basic principle to be sound. If an administrative agency acted legitimately on grounds that are otherwise sufficient, that sufficiency will not be nullified by the presence of erroneous or improper grounds.
WFSE's challenge to OFM's disapproval of the "catchup" increase must therefore fail. The mere fact that OFM may also have been motivated by concern with the Board's research methods is legally irrelevant, as long as OFM actions were *162 justified on statutorily authorized grounds. Since WFSE does not contest OFM's claim of negative "fiscal impact", it cannot rely upon allegations of "impure" motives to render OFM's decisionmaking unlawful.

B
Local 17, on the other hand, alleges OFM did not consider "fiscal impact" at all, but rather disapproved the pay increase solely for political reasons. Local 17 concedes the increase did in fact have a "fiscal impact", but contends that impact was not the reason for OFM's disapproval.
Our review of the record reveals Local 17 did not adequately raise this factual allegation below. For example, Local 17's motion in opposition to summary judgment explicitly limited the issue presented to the trial court as limited to whether OFM's disapproval had been "piecemeal".
Furthermore, the court below recognized that a factual allegation like the one now raised by Local 17 could preclude summary judgment. In expressing this recognition, the court pressed counsel on the contentions regarding OFM's motives to determine the extent of the factual allegations which were being raised. At the time, counsel for WFSE expressly disclaimed the allegation now made by Local 17, and Local 17 voiced no opposition to this disclaimer.[5]
*163 [3] Generally, an appellate court will not consider an issue not raised below. Rones v. Safeco Ins. Co. of Am., 119 Wn.2d 650, 656, 835 P.2d 1036 (1992); Hansen v. Friend, 118 Wn.2d 476, 485, 824 P.2d 483 (1992). This rule also applies to attempts to raise factual allegations at the appellate level that were not before a trial court in granting summary judgment. See Kendall v. Douglas, Grant, Lincoln & Okanogan Cys. Pub. Hosp. Dist. 6, 118 Wn.2d 1, 8-10, 820 P.2d 497 (1991) (appellate court refused to consider evidence outside of the record submitted by party opposing summary judgment). To do otherwise would be to undermine the rule that an appellate court is to engage in the same inquiry as the trial court in reviewing an order of summary judgment. Local 17 therefore may not raise the allegation that OFM had no "fiscal impact" motive in disapproving the "catchup" increase.

V
WFSE and Local 17 also challenge OFM's disapproval of the "catchup" increase as a "piecemeal" alteration of an amendment to a state salary plan and therefore outside of OFM's statutory authority. They argue that OFM's authority to "amend or alter" revisions to the state salary schedule does not include the authority to make "piece-meal" changes to the amendments adopted by the Board.
[4] The purpose of statutory construction, of course, is to effectuate the intent of the Legislature. State v. Johnson, 119 Wn.2d 167, 172, 829 P.2d 1082 (1992); Seven Gables Corp. v. MGM/UA Entertainment Co., 106 Wn.2d 1, 6, 721 P.2d 1 (1986). When possible, that intent is to be derived initially from the language of the statute itself. Cossel v. Skagit Cy., 119 Wn.2d 434, 436, 834 P.2d 609 (1992); State v. Reding, 119 Wn.2d 685, 690, 835 P.2d 1019 (1992).
[5] The budget statute authorizes OFM to "amend or alter" both salary and classification plans and "changes thereunder" *164 for their "fiscal impact". The personnel statute also reflects OFM's authority in this regard. See RCW 41.06.150(17). This statutory language permits precisely the type of discretion exercised by OFM in rejecting the 5 percent "catchup" increase. OFM's action constituted a decision by OFM to "amend or alter" a "change" to a state salary schedule on the basis of "fiscal impact".
The labor organizations, however, argue that OFM's authority to "amend or alter" salary plan changes is actually much more limited. They argue "amend or alter" does not include the authority for OFM to make "piecemeal" alterations in amendments proposed by the Board. For this limitation on the meaning of "alter or amend", the unions rely principally on an Attorney General Opinion from 1967 and dicta from this court's decision in Ortblad v. State, 85 Wn.2d 109, 530 P.2d 635 (1975).
[6, 7] In 1967, the Attorney General's office issued an opinion on the issue now before the court.[6] According to this opinion, OFM's authority in regard to changes proposed by the Board is limited solely to approval or disapproval of the revised schedule provided by the Board. AGO 10, at 7 (1967). Opinions of the Attorney General are entitled to considerable weight, but are not controlling upon this court. Elovich v. Nationwide Ins. Co., 104 Wn.2d 543, 550, 707 P.2d 1319 (1985) (citing Kasper v. Edmonds, 69 Wn.2d 799, 805, 420 P.2d 346 (1966)); Everett Concrete Prods., Inc. v. Department of Labor & Indus., 109 Wn.2d 819, 828, 748 P.2d 1112 (1988). In particular, we give less deference to such opinions when they involve issues of statutory interpretation. See, e.g., American Legion Post 32 v. Walla Walla, 116 Wn.2d 1, 9, 802 P.2d 784 (1991) (rejecting AGO interpretation of statutory term "primarily"); Davis v. County of King, 77 Wn.2d 930, 934, 468 P.2d 679 (1970) (rejecting AGO resolution of apparently conflicting *165 statutes). This reduced deference results from our recognition that "[t]he court remains the final authority on the proper construction of a statute." Davis, 77 Wn.2d at 934. In this case, we decline to follow the AGO because it is based ultimately upon a flawed interpretation of the statutory budget scheme.
The AGO provides two explanations for its conclusions regarding the limits on OFM's authority. First, it asserts that OFM's authority to "amend or alter" state salary schedules was "impliedly repealed" by the initiative establishing the Board. See AGO 10, at 5 n. 4. No analysis is supplied to justify this conclusion, and in fact, the test for implicit repealer is not met.
[8] The test for implicit repealer is well established in Washington. A statute will be deemed to be implicitly repealed only if:
[T]he later act covers the entire subject matter of the earlier legislation, is complete in itself, and is evidently intended to supersede the prior legislation on the subject, or unless the two acts are so clearly inconsistent with, and repugnant to, each other that they cannot, by a fair and reasonable construction, be reconciled and both given effect.
Abel v. Diking & Drainage Imp. Dist. 4, 19 Wn.2d 356, 363, 142 P.2d 1017 (1943). Accord, In re Chi-Dooh Li, 79 Wn.2d 561, 565, 488 P.2d 259 (1971); Local 497 v. PUD 2, 103 Wn.2d 786, 789, 698 P.2d 1056 (1985) (quoting Paulson v. County of Pierce, 99 Wn.2d 645, 650, 664 P.2d 1202, appeal dismissed, 464 U.S. 957 (1983)).
The test is thus a 2-pronged disjunctive inquiry. In this case, neither of the alternative conditions for implicit repealer is fulfilled. The first condition is not met because the initiative which produced the personnel statute does not evidence an intent to supersede the previously established authority of OFM. In fact, Initiative 207 explicitly referred to the authority of OFM under RCW 43.88 by providing: "[A]doption and revision [of state salary schedules is] subject to approval by [OFM] in accordance with provisions of chapter 328, Laws of 1959 [now RCW 43.88] ...." Initiative *166 207, § 15, Voters Pamphlet (1960). Initiative 207 cannot be held to have had an intent to implicitly repeal a statute which it explicitly incorporates.
The second condition for implicit repealer is not met because the statutes are not clearly inconsistent and repugnant to each other. One, RCW 41.06, provides the Board with authority to create and revise salary and classification plans. The other, RCW 43.88, authorizes OFM to review and amend those plans for "fiscal impact". There is thus a clearly defined division of labor with respect to the implementation of the salary and classification plans. As such, there is no clear conflict between the statutes as would justify a finding of implicit repealer.[7]
The AGO's second explanation for its conclusion is: "[T]he [statute] has reference only to fiscal management and manpower planning and not to classification and salary plans adopted or revised by the state personnel board." AGO 10, at 5 n. 4. In other words, the AGO takes the position that RCW 43.88 provides no authority at all for OFM to review the salary schedules and classification plans.
The AGO's position is contrary to the language of the statutes. OFM's review authority under the statute applies to "said plans", which refers to the "pay and classification plans" produced by "any" state agency. RCW 43.88.160(4)(c). Further, the personnel statute explicitly recognizes that "adoption and revision" of the salary schedules are "subject to approval" by OFM under RCW 43.88. RCW 41.06.150(17). Moreover, in Ortblad v. State, 85 Wn.2d 109, 114, 530 P.2d 635 (1975), we expressly held that OFM had the authority to review the state salary schedules under RCW 43.88. The AGO's assertion that OFM has no authority to review the state salary schedules is simply incorrect.
*167 The labor organizations also rely upon our decision in Ortblad v. State, supra, in citing the following language:
[I]t is clear that the role of [OFM], while not permitting "piecemeal" alterations of the plan, does include amendment or alteration of such plans because of "fiscal impact."
(Footnote omitted.) Ortblad, 85 Wn.2d at 114.
This statement does not control our decision. The question in Ortblad was whether or not OFM had any authority to review salary and classification plans. After examining the statutes, the Ortblad court rejected the theory that OFM was required to automatically approve the plans developed by the Board. Ortblad, 85 Wn.2d at 114. In so holding, the court did not inquire into the actual scope of OFM's review authority, but only decided that such a review authority existed.
In addition to being contrary to the language and history of the statute, the interpretation offered by the labor organizations would lead to an unreasonable system of budgetary control. According to WFSE and Local 17, OFM would be limited to approving or disapproving all proposals coming out of a single meeting of the Board. In this case, OFM would have to approve or disapprove all the proposals from the May 11 meeting. The result of this reasoning would be that OFM's authority to review the actions of the Board would be entirely dependent upon the timeframe in which the Board acted. If the Board adopted four changes over the course of four separate meetings, OFM could review each of those changes for "fiscal impact". If, on the other hand, those changes were adopted at a single sitting of the Board, OFM would be limited to reviewing those changes in toto. We see no inherent reason in such a system of budgetary oversight.
For these reasons, we affirm the trial court's grant of summary judgment.
ANDERSEN, C.J., and BRACHTENBACH, DURHAM, SMITH, GUY, and JOHNSON, JJ., concur.
NOTES
[1] According to Director McComb, the background summary was not transmitted to Director Henderson as a component of the September 27 memorandum. In its response to the September 27 memorandum, however, the Board treated the two documents as if they had been distributed simultaneously.
[2] The Board has not taken part in these legal proceedings.
[3] "Salary schedule" refers to the compensation of employees. "Classification plan", on the other hand, refers to the qualifications and job requirements of particular classes of employees.
[4] For example, on at least one past occasion, OFM simply reduced the entire salary schedule across the board by a fixed percentage. See Ortblad v. State, 85 Wn.2d 109, 113, 530 P.2d 635 (1975).
[5] The following colloquy is revealing:

"THE COURT: I think I have to accept that there's not a genuine issue of material fact that there was fiscal impact, because I think everybody's conceded that the  nobody is arguing that the Director did not have a basis for saying no fiscal  or adverse fiscal impact.
"There is argument that he's got no business saying, Well, you didn't have the required documentation of recruiting and/or retention history problems.['] That's one argument.
"But nobody is saying that, `Oh, that he speaketh with a forked tongue when he said adverse fiscal impact.' Because if he did that, then I'd say, `Well, this has all been very interesting, but it's not appropriate for summary judgment and we'll decide this on the factual issue of whether or not there is a fiscal impact because if there's not an adverse fiscal impact, then he has no authority to withhold his approval, in any event.' But 
"MR. LYON [counsel for the Federation]: Yes.
"THE COURT: So am I right in understanding that there's no contention that the OFM Director did not make as one of his reasons, legitimate reasons, adverse fiscal impact?
"MR LYON: I believe there's no contention. Frankly, Your Honor, I'm not in a position here to raise one if there was." Verbatim Report of Proceedings, at 52-53.
During this exchange counsel for Local 17 remained silent.
[6] The authority of the Board to generate salary and classification plans was originally established in 1960 by Initiative 207. Initiative 207 (Nov. 1960). OFM's authority to review such plans for "fiscal impact", regardless of the originating agency, had been established in the budget and accounting act of 1959. See Laws of 1959, ch. 328.
[7] The AGO attempts to support a conclusion of incompatibility by asserting that a broad interpretation of RCW 43.88 would "have the effect of making the budget director, rather than the state personnel board, the state's salary setting agency, ...." AGO 10, at 9. This observation is incorrect. Review by OFM is explicitly limited to "fiscal impact", not to setting salaries generally. Allowing OFM the authority to "amend or alter" salary schedules in detail for "fiscal impact" is not tantamount to granting OFM general salary setting authority.