IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| RHONDA MOEN, a married individual, | ) | No. 74260-4-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| NORTHWEST EDUCATIONAL SERVICE DISTRICT NO. 189, a municipal corporation, | ) | |
| | ) | |
| Appellant. | ) | FILED: December 5, 2016 |

SCHINDLER, J. — To establish wrongful discharge in violation of public policy, a plaintiff must identify a clear mandate of public policy in the constitution, a statute, or a prior court decision. Rhonda Moen filed a lawsuit against Northwest Educational Service District No. 189 alleging constructive wrongful discharge in violation of public policy. The court denied summary judgment dismissal of the claim. We granted discretionary review. Because Moen does not identify a clear mandate of public policy, we reverse and remand to enter an order dismissing the lawsuit.

FACTS

Educational Service Districts are regional agencies that provide "informational services to local school districts" and "[a]ssist the superintendent of public instruction and the state board of education in the performance of their respective statutory or

constitutional duties" including "[c]ooperative curriculum services such as health promotion and health education services." RCW 28A.310.010(1), (2); RCW 28A.310.350(2).

Northwest Educational Service District No. 189 (NWESD) provides services to school districts in Island, San Juan, Skagit, Snohomish, and Whatcom counties. One of the services NWESD offers the school districts is a drug and alcohol prevention and intervention curriculum—"Project SUCCESS." The goal of Project SUCCESS is to help adolescents understand substance abuse and prevent and reduce the use of alcohol, tobacco, and drugs. Project SUCCESS is funded through a grant from the Washington State Department of Social and Health Services Division of Behavioral Health and Recovery and implemented under the auspices of the Washington State Office of Superintendent of Public Instruction (OSPI).

NWESD employs prevention intervention specialists to implement Project SUCCESS at participating schools. The prevention intervention specialist is accountable to NWESD and the school principal. The school principal is responsible for the on-site supervision of the prevention intervention specialist and the day-to-day operation of Project SUCCESS.

Project SUCCESS is designed to be presented in three phases. In Phase I, the "Prevention Education Series," the curriculum addresses adolescence, the cause and effect of drug abuse, and how substance abuse can affect a family. The Prevention Education Series is presented over the course of six to eight class periods one to three times a week. During Phase II, the prevention intervention specialist assesses the level of risk as well as the physical and mental functioning of students including family and

peer relationships; alcohol, tobacco, and other drug use; risk-taking behavior; and violence. In Phase III, the prevention intervention specialist may schedule individual or group sessions with students or parents and refer students to substance abuse or mental health treatment.

In November 2012, NWESD hired Rhonda Moen as a Project SUCCESS prevention intervention specialist at Marysville Middle School for the 2012-2013 school year. The NWESD policy manual states that prevention intervention specialists are at-will employees "granted provisional trial status during the first six (6) months of employment. During that period of time, they are subject to termination without advance notice." At the time of hire, Moen acknowledged she received and reviewed the NWESD policy manual.

After being assigned to Marysville Middle School, Moen received training on the Project Success curriculum. Because Moen was not hired until November 2012 and was not trained until January 2013, implementation of the Project SUCCESS curriculum was delayed until spring of the 2012-2013 school year.

On March 5, 2013, Moen informed her supervisor, NWESD Behavioral Health and Prevention Services Director Jodie DesBiens, about her frustration with Marysville Middle School Principal Susan Hegeberg. Moen told DesBiens that Hegeberg had not sent out the parental permission slips necessary to begin teaching the Project SUCCESS curriculum. DesBiens told Moen she would talk to Hegeberg "and try and hurry things along."

DesBiens contacted Hegeberg to discuss Moen's frustration with the permission slips. According to DesBiens, Hegeberg said she "was not aware of the timeliness"

need for the permission slips. Hegeberg sent the permission slips to parents on March 18.

DesBiens met with Moen on March 19. According to DesBiens, because of the delay in sending out the permission slips, Moen "felt like it was too late in the year" to teach the curriculum. Moen also said she "wasn't comfortable" delivering the Prevention Education Series curriculum in front of classrooms. DesBiens told Moen "we were still going forward" as planned and approved by OSPI. DesBiens said NWESD Behavioral Health and Prevention Services Program Manager Wendi Thomas was available to help Moen teach the curriculum.

On March 26, Moen met with DesBiens and Thomas to discuss her "ongoing frustration" with Hegeberg. DesBiens and Thomas explained to Moen that "she must follow directives given by Principal Hegeberg."

On March 28, DesBiens and Thomas met with Hegeberg. Hegeberg told DesBiens and Thomas that Moen did not respect her authority and argued with her in front of the Marysville Middle School staff.

On March 29, Hegeberg met with Moen. According to Moen, Hegeberg told her to teach Phase I of Project SUCCESS to 109 students in the school cafeteria for 20 minutes each day "but not Phase II and III." Moen said she told Hegeberg it would be unethical for her to teach the program in the manner requested by Hegeberg because "it could potentially cause emotional harm to the students."

After DesBiens learned that Moen refused to implement Project SUCCESS as directed by Hegeberg, NWESD placed Moen on paid administrative leave.

Moen tried without success to contact the developer of Project SUCCESS. Moen then contacted Community Prevention and Wellness Initiative Coalition Coordinator Joseph Neigel. DesBiens also talked to Neigel. Neigel's "only concern" was that if the program began during the last week of school, "there would not be an opportunity to follow-up with students before school was out for the summer."

On April 1, DesBiens and NWESD Assistant Superintendent for Operations Buckley Evans met with Moen. Moen told DesBiens and Evans that Neigel told her NWESD should not leave students "exposed and emotional the last week of school." DesBiens and Evans stated that "no decision had been made on when Project Success would start, but that it would not be within the last two weeks of school." Evans told Moen he wanted to schedule a meeting between Moen and Hegeberg to resolve their differences.

Moen insisted she "could not teach Project Success with only three months left in the school year." Evans told Moen her refusal to teach Project SUCCESS meant "she was not fulfilling the requirements of her job" as a prevention intervention specialist. Moen stated she "realized she was putting herself in a position of insubordination and that she would resign her position."

After the meeting, Moen submitted a letter of resignation to NWESD dated April 1, 2013. The letter states, in pertinent part:

> After looking back at the suggested ways to implement Project Success with Fidelity it is my belief that it is not true enough to how it's supposed to be presented. I do not feel morally or ethically able to implement the Project Success curriculum in the manner in which it is being asked of me. I refuse to teach Project Success as it goes against my professional, moral and ethical judgment with students.

> I have not been able to perform the necessary requirements of project success because of Susan Hegebergs [sic] in-ability to allow the flow of services to occur.
>
> In addition to Project Success, I have not been given adequate time to talk with staff which is also a requirement of my job. I was given 5 min. to present on Jan. 11, 2013.
>
> I do realize that my refusal puts me in a position of insubordination and I am willing to accept those consequences.

Moen filed a lawsuit against NWESD alleging constructive wrongful discharge in violation of public policy, negligent infliction of emotional distress, defamation of character, and false light.

The complaint alleged that demanding Moen to teach Program SUCCESS as required by NWESD and Hegeberg placed the students at risk for emotional harm. The complaint alleged, in pertinent part:

> [I]t was demanded of [Moen] that she teach this class contrary to the methodology in which the class was designed to be instructed and without fidelity. . . . The manner in which Ms. Hegeberg demanded the class be taught and the refusal of [NWESD] to support the Plaintiff placed the students who would attend this class at risk for emotional harm.

NWESD filed a motion for summary judgment dismissal of the lawsuit. The court dismissed all claims except constructive wrongful discharge in violation of public policy. The court ruled genuine issues of material fact precluded summary judgment dismissal of the claim. We granted discretionary review.

## ANALYSIS

NWESD contends the court erred in denying summary judgment dismissal of the constructive wrongful discharge in violation of public policy claim. NWESD argues that as a matter of law Moen did not identify a clear public policy to establish the clarity element of wrongful discharge in violation of public policy.

We review summary judgment de novo. Citizens All. for Prop. Rights Legal Fund v. San Juan County, 184 Wn.2d 428, 435, 359 P.3d 753 (2015). Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Scrivener v. Clark Coll., 181 Wn.2d 439, 444, 334 P.3d 541 (2014). If the nonmoving party " 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' " then the court should grant summary judgment. Young v. Key Pharm., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

As a general rule, an employer may terminate an at-will employee "without fear of liability." Thompson v. St. Regis Paper Co., 102 Wn.2d 219, 226, 685 P.2d 1081 (1984). But the Washington Supreme Court recognizes as a narrow exception to the common law doctrine of at-will employment a cause of action in tort for wrongful discharge in violation of public policy. Thompson, 102 Wn.2d at 232.

To establish a cause of action for wrongful discharge in violation of public policy, the employee must "plead and prove that a stated public policy, either legislatively or judicially recognized, may have been contravened." Thompson, 102 Wn.2d at 232.

In Gardner v. Loomis Armored Inc., 128 Wn.2d 931, 913 P.2d 377 (1996), the Washington Supreme Court utilized the four-part Perritt framework to analyze a claim for wrongful discharge in violation of public policy. Gardner, 128 Wn.2d at 941; HENRY H. PERRITT, JR., WORKPLACE TORTS: RIGHTS AND LIABILITIES §§ 3.7-3.21 (1991).

However, the court makes clear that adoption of this test "does not change the existing common law in this state." Gardner, 128 Wn.2d at 941.

Under the Perritt framework, the court examines (1) the existence of a clear public policy, the clarity element; (2) whether the employer's actions would jeopardize the public policy, the jeopardy element; and (3) whether the public-policy-linked conduct caused the dismissal, the causation element. Rose v. Anderson Hay & Grain Co., 184 Wn.2d 268, 277, 358 P.3d 1139 (2015). If the plaintiff proves these three elements, then the burden shifts to the defendant to prove (4) there was an overriding justification for terminating the employee, the absence of justification element. Rose, 184 Wn.2d at 277; Gardner, 128 Wn.2d at 941.

Whether there is a clear mandate of public policy is a question of law we review de novo. Dicomes v. State, 113 Wn.2d 612, 617, 782 P.2d 1002 (1989); Gardner, 128 Wn.2d at 937. The public policy " 'for which we search is an authoritative public declaration of the nature of the wrong.' " Roe v. TeleTech Customer Care Mgmt. (Colorado) LLC, 171 Wn.2d 736, 757, 257 P.3d 586 (2011) (quoting Roberts v. Dudley, 140 Wn.2d 58, 63, 993 P.2d 901 (2000)). Only clear violations of important recognized public policies can expose employers to liability. Rose, 184 Wn.2d at 27.

In Dicomes, the Washington Supreme Court states:

> Courts have found contravention of a clear mandate of public policy in four general areas: (1) where the discharge was a result of refusing to commit an illegal act; (2) where the discharge resulted due to the employee performing a public duty or obligation; (3) where the termination resulted because the employee exercised a legal right or privilege; and (4) where the discharge was premised on employee "whistleblowing" activity.

Dicomes, 113 Wn.2d at 618.[1]

---

[1] Citations omitted.

In <u>Rickman v. Premera Blue Cross</u>, 184 Wn.2d 300, 309, 358 P.3d 1153 (2015), the court reiterated "the employee has the burden of proving the dismissal violates a clear mandate of public policy" in the constitution, a statute, or a prior court decision.

> This means "a court may not sua sponte manufacture public policy but rather must rely on that public policy previously manifested in the constitution, a statute, or a prior court decision." <u>Roberts v. Dudley</u>, 140 Wn.2d 58, 65, 993 P.2d 901 (2000); <u>see also Thompson</u>, 102 Wn.2d at 232 (noting we determine the public policy from " 'the letter or purpose of a constitutional, statutory, or regulatory provision or scheme' " or " '[p]rior judicial decisions' " (quoting <u>Parnar v. Americana Hotels, Inc.</u>, 65 Haw. 370, 652 P.2d 625, 631 (1982))).

<u>Rickman</u>, 184 Wn.2d at 309-10.[2]

NWESD argues Moen does not identify a clear mandate of public policy to support her wrongful discharge in violation of public policy claim. In her complaint, Moen alleges NWESD demanded she teach the Project SUCCESS curriculum "contrary to the methodology in which the class was designed to be instructed" and in a manner that "placed the students who would attend this class at risk for emotional harm." Moen identifies four statutes in support of her wrongful discharge in violation of public policy claim: RCW 28A.300.070, RCW 28A.310.500, RCW 28A.320.127, and RCW 28A.320.1271. In opposition to summary judgment, Moen also cited RCW 28A.310.010. On appeal, Moen concedes RCW 28A.310.010 does not establish the clarity element.[3] In support of the motion to modify the commissioner's ruling granting

---

[2] Alteration in original.

[3] RCW 28A.310.010 states:
It shall be the intent and purpose of this chapter to establish educational service districts as regional agencies which are intended to:
    (1) Provide cooperative and informational services to local school districts;
    (2) Assist the superintendent of public instruction and the state board of education in the performance of their respective statutory or constitutional duties; and
    (3) Provide services to school districts and to the Washington state center for childhood deafness and hearing loss and the school for the blind to assure equal educational opportunities.

discretionary review, for the first time Moen identified two additional statutes—RCW 28A.300.2851 and RCW 28A.320.125. But when reviewing an order denying a motion for summary judgment, we consider only the evidence and issues called to the attention of the trial court. RAP 9.12; <u>Wash. Fed'n of State Emp.'s, Council 28, AFL-CIO v. Office of Fin. Mgmt.</u>, 121 Wn.2d 152, 157, 849 P.2d 1201 (1993).[4]

The interpretation of a statute is a matter of law subject to de novo review. <u>Castro v. Stanwood Sch. Dist. No. 401</u>, 151 Wn.2d 221, 224, 86 P.3d 1166 (2004). "Where the language of a statute is clear, legislative intent is derived from the language of the statute alone." <u>City of Spokane v. Rothwell</u>, 166 Wn.2d 872, 876, 215 P.3d 162 (2009).

Three of the statutes Moen relies on, RCW 28A.310.500,[5]

---

[4] RCW 28A.300.2851 states, in pertinent part:

(1) The office of the superintendent of public instruction and the office of the education ombuds shall convene a work group on school bullying and harassment prevention to develop, recommend, and implement strategies to improve school climate and create respectful learning environments in all public schools in Washington. The superintendent of public instruction or a designee shall serve as the chair of the work group.

RCW 28A.320.125 states, in pertinent part:

(1) The legislature considers it to be a matter of public safety for public schools and staff to have current safe school plans and procedures in place, fully consistent with federal law. The legislature further finds and intends, by requiring safe school plans to be in place, that school districts will become eligible for federal assistance. The legislature further finds that schools are in a position to serve the community in the event of an emergency resulting from natural disasters or man-made disasters.

[5] Former RCW 28A.310.500 (LAWS OF 2013, ch. 197, § 6) states:

Each educational service district shall develop and maintain the capacity to offer training for educators and other school district staff on youth suicide screening and referral, and on recognition, initial screening, and response to emotional or behavioral distress in students, including but not limited to indicators of possible substance abuse, violence, and youth suicide. An educational service district may demonstrate capacity by employing staff with sufficient expertise to offer the training or by contracting with individuals or organizations to offer the training. Training may be offered on a fee-for-service basis, or at no cost to school districts or educators if funds are appropriated specifically for this purpose or made available through grants or other sources.

RCW 28A.320.127,[6] and RCW 28A.320.1271,[7] were not in effect when Moen resigned on April 1, 2013. On April 22, 2013, the legislature passed "K-12 SCHOOLS—TROUBLED YOUTH . . . . AN ACT Relating to increasing the capacity of school districts to recognize and respond to troubled youth." LAWS OF 2013, ch. 197. This act added new sections to chapter 28A.310 RCW and chapter 28A.320 RCW including RCW 28A.310.500, RCW 28A.320.127, and RCW 28A.320.1271. LAWS OF 2013, ch. 197, §§ 6, 4, 5. The governor signed the act on May 10, 2013 and it became effective on July 28, 2013. LAWS OF 2013, ch. 197, § 10; LAWS OF 2013, at ii. Because RCW 28A.310.500, RCW 28A.320.127, and RCW 28A.320.1271 were not in effect at the time Moen resigned, they do not establish a clear mandate of public policy related to her claim.

RCW 28A.300.070 was in effect when Moen resigned. RCW 28A.300.070 provides:

> The state of Washington and/or any school district is hereby authorized to receive federal funds made or hereafter made available by acts of congress for the assistance of school districts in providing physical facilities and/or maintenance and operation of schools, or for any other educational purpose, according to provisions of such acts, and the state

---

[6] Former RCW 28A.320.127 (LAWS OF 2013, ch. 197, § 4) states, in pertinent part:
(1) Beginning in the 2014-15 school year, each school district must adopt a plan for recognition, initial screening, and response to emotional or behavioral distress in students, including but not limited to indicators of possible substance abuse, violence, and youth suicide. The school district must annually provide the plan to all district staff.

[7] RCW 28A.320.1271 states:
The office of the superintendent of public instruction and the school safety [center] advisory committee shall develop a model school district plan for recognition, initial screening, and response to emotional or behavioral distress in students, including but not limited to indicators of possible substance abuse, violence, and youth suicide. The model plan must incorporate research-based best practices, including practices and protocols used in schools and school districts in other states. The model plan must be posted by February 1, 2014, on the school safety center web site, along with relevant resources and information to support school districts in developing and implementing the plan required under RCW 28A.320.127.

(Alteration in original.)

superintendent of public instruction shall represent the state in the receipt and administration of such funds.

The clear and unambiguous language of RCW 28A.300.070 authorizes school districts to receive federal funds for educational purposes. RCW 28A.300.070 does not establish a clear mandate of public policy that supports Moen's wrongful discharge in violation of public policy claim—that she was required to teach the Project SUCCESS curriculum contrary to the methodology of the program or in a manner that might place students at risk of emotional harm.

As a matter of law Moen has not identified a statute containing a clear mandate of public policy. We reverse denial of summary judgment and remand to enter an order of dismissal of the wrongful discharge in violation of public policy claim.[8]

WE CONCUR:

Trickey, ACJ

Spearman, J.

---

[8] Because Moen does not identify a clear mandate of public policy, we need not consider whether Moen "presented sufficient evidence to take the issue of constructive discharge to a trier of fact." See Korslund v. DynCorp Tri-Cities Servs., Inc., 156 Wn.2d 168, 181, 125 P.3d 119 (2005), overruled on other grounds by Rose, 184 Wn.2d at 280.