**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE OCT 0 1 2015

CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on Oct 1, 2015

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| CITIZENS ALLIANCE FOR PROPERTY RIGHTS LEGAL FUND, a Washington nonprofit corporation, | No. 90500-2 |
| Petitioner, | En Banc |
| v. | |
| SAN JUAN COUNTY, a Washington municipal corporation, and SAN JUAN COUNTY CRITICAL AREAS ORDINANCE/ SHORELINE MASTER PROGRAM IMPLEMENTATION COMMITTEE, a subcommittee of the San Juan County Council, and its Members RICHARD FRALICK, PATTY MILLER, and LOVEL PRATT, | Filed OCT 0 1 2015 |
| Respondents. | |

WIGGINS, J.—In this case, the Citizens Alliance for Property Rights Legal Fund (CAPR) seeks to invalidate several ordinances passed by the governing council of San Juan County (County), alleging violations of Washington's Open Public Meetings Act of 1971, chapter 42.30 RCW (OPMA). Specifically, CAPR asserts that four ordinances passed as part of a state-mandated update of the County's critical area ordinances (CAO) should be voided because the ordinances had first been discussed by an informal group of county officials and employees (CAO Team) in meetings that did not comply with the OPMA. We reject CAPR's

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

arguments because (1) none of the CAO team meetings constituted "meetings" of the San Juan County Council (Council) under the OPMA, (2) the CAO Team itself was not a "committee" of the Council, and (3) the CAO Team never acted on behalf of the Council.

## BACKGROUND

At all times relevant to this appeal, the County operated under a home rule charter that vested legislative functions in the Council, consisting of six voting members. SAN JUAN COUNTY HOME RULE CHARTER art. 2, §§ 2.10, 2.11, 2.30(1). The charter specified that the Council cannot act without the affirmative vote of four of its members. *Id.* § 2.40(3). Further, the charter placed all administrative and executive functions under the purview of a county administrator hired by the Council. *Id.* §§ 3.41, 3.43. During the relevant time period, Pete Rose served as county administrator.

In 2010, the County began the process of updating its CAO as required by the Growth Management Act (GMA), chapter 36.70A RCW. The County had initiated the CAO update process on two prior occasions but had failed to pass the required update both times. By the time the County initiated the third effort to update the CAO, the required update was already four years overdue.

The CAO Team appears to have been an informal group that met occasionally to discuss how to implement the CAO update. The informal nature of the team is reflected by the near-complete absence of official documents referencing the team or its work. For example, the record provides few clues as to how the CAO Team came into existence. It does not appear that it was created

2

through a formal legal instrument such as a legislative resolution or an executive directive. Likewise, no documents in the record indicate how the members of the CAO Team were chosen—in fact, none of the documents in the record suggests that the CAO Team even had an official list of members. The record also does not contain any documents indicating that the CAO Team had any formal purpose, list of responsibilities, or official relationship to other county agencies.

This informal group met approximately 26 times between July 2010 and February 2012. The CAO Team did not keep attendance records, and the record provides little information on who attended many of the individual team meetings. In a response to an interrogatory, the County stated that 10 individuals attended at least one CAO team meeting: Pete Rose, the county administrator; Jon Cain, a deputy prosecutor from the San Juan County Prosecuting Attorney's Office; Paul Adamus, a consultant; Shireene Hale, Janice Biletnikoff, Colin Maycock, and Rene Beliveau, all members of the County's planning staff; and three members of the Council—Richard Fralick, Lovel Pratt, and Patty Miller. CAPR does not allege, and the record does not indicate, that any members of the Council besides Fralick, Pratt, and Miller attended any CAO team meetings.

During the period that the CAO Team was meeting, the Council continued its work related to the CAO update. The record indicates that the Council held 70 different meetings, workshops, hearings, or joint hearings regarding the CAO update between 2010 and 2012. On April 26, 2012, San Juan County Prosecuting Attorney Randall Gaylord submitted a memorandum to the Council suggesting that all gatherings involving at least three members of the Council should comply with

3

the OPMA. Following this memorandum, the CAO Team did not hold any further meetings.

After the CAO Team ceased meeting, the Council met over 25 times and continued to hold public discussions, hearings, and readings of the CAO update. In December 2012, the Council completed the CAO update process by adopting the four ordinances that CAPR now seeks to invalidate. All four of these ordinances were passed by a five to one vote of the Council. None of the adopted ordinances refers to the work or recommendations of the CAO Team.

Shortly before the ordinances were adopted, CAPR filed a complaint against the County, the CAO Team, and the three council members who attended CAO team meetings—Fralick, Miller, and Pratt. After discovery was completed, the County moved for summary judgment. The trial court granted the motion and denied CAPR's motion for reconsideration.

CAPR appealed. The Court of Appeals affirmed the trial court's dismissal of CAPR's complaint, concluding that the OPMA did not apply to the CAO team meetings because CAPR submitted no evidence that a majority of the Council attended CAO team meetings or that the CAO Team acted "on behalf of" the Council, as required by the OPMA. *See Citizens All. for Prop. Rights Legal Fund v. San Juan County*, 181 Wn. App. 538, 545, 326 P.3d 730, *review granted*, 181 Wn.2d 1015 (2014).

## STANDARD OF REVIEW

We review grants of summary judgment de novo, engaging in the same inquiry as the trial court. *Amalgamated Transit Union Local 587 v. State*, 142 Wn.2d

4

183, 206, 11 P.3d 762, 27 P.3d 608 (2000). Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c).

Construction of a statute is a question of law that we review de novo. *State v. Ammons*, 136 Wn.2d 453, 456, 963 P.2d 812 (1998). On matters of statutory interpretation, our "fundamental objective is to ascertain and carry out the Legislature's intent." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). "[I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." *Id.* at 9-10. When determining a statute's plain meaning, we consider "the ordinary meaning of words, the basic rules of grammar, and the statutory context to conclude what the legislature has provided for in the statute and related statutes." *In re Forfeiture of One 1970 Chevrolet Chevelle*, 166 Wn.2d 834, 838-39, 215 P.3d 166 (2009). We consider other matters, including legislative history, if "the statute remains susceptible to more than one reasonable meaning" after completing this plain-meaning analysis. *Campbell & Gwinn*, 146 Wn.2d at 12.

## ANALYSIS

We conclude that the OPMA did not apply to the CAO team meetings. The OPMA applies only to meetings of "'[g]overning bod[ies],'" a term that applies both to legislative entities such as the Council and "committee[s] thereof" when the committee "acts on behalf of" the legislative entity. RCW 42.30.020(2). Here, none of the CAO team meetings constituted meetings of the Council itself under the OPMA because none of the meetings included a majority of council members.

5

Moreover, the CAO Team was not a "committee thereof" with respect to the Council because CAPR produced no evidence indicating that the Council created the CAO Team. The CAO Team also never "acted on behalf of" the Council and thus could not have constituted a "governing body" under the OPMA even if the Council had created it. We therefore affirm the dismissal of CAPR's complaint.

I.    Statutory Construction

RCW 42.30.030 sets forth the OPMA's prohibition against closed public meetings:

> All *meetings* of the *governing body* of a public agency shall be open and public and all persons shall be permitted to attend any meeting of the governing body of a public agency, except as otherwise provided in this chapter.

(Emphasis added.) Another section of the OPMA provides the definitions of the above-emphasized terms:

> (2) "Governing body" means the multimember board, commission, committee, council, or other policy or rule-making body of a public agency, or any *committee thereof* when the committee *acts on behalf of the governing body*, conducts hearings, or takes testimony or public comment.
>
> . . . .
>
> (4) "Meeting" means meetings at which action is taken.

RCW 42.30.020 (emphasis added). Unfortunately, while subsection (4) purports to define "meeting," it actually does no more than specify *when* meetings are subject to the OPMA without clarifying what a "meeting" itself is. The OPMA also does not provide any guidance on the meanings of "committee thereof" and "acts on behalf of" as those terms are used in subsection (2)'s definition of "governing body."

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

In giving meaning to an undefined term, we "consider the statute as a whole and provide such meaning to the term as is in harmony with other statutory provisions." *Heinsma v. City of Vancouver*, 144 Wn.2d 556, 564, 29 P.3d 709 (2001). Though undefined terms in a statute are given their common law or ordinary meanings, *see State v. Chester*, 133 Wn.2d 15, 22, 940 P.2d 1374 (1997), the words "must be read in the context of the statute in which they appear, not in isolation or subject to all possible meanings found in a dictionary." *State v. Lilyblad*, 163 Wn.2d 1, 9, 177 P.3d 686 (2008). "Ultimately, in resolving a question of statutory construction, this court will adopt the interpretation which best advances the legislative purpose." *Bennett v. Hardy*, 113 Wn.2d 912, 928, 784 P.2d 1258 (1990).

The attorney general's office (AGO) construed both "committee thereof" and "acts on behalf of" in an opinion issued in 1986, three years after the legislature amended the OPMA by adding those terms to the definition of "governing party." *See* 1986 Op. Att'y Gen. No. 16, http://www.atg.wa.gov/ago-opinions/applicability-open-public-meetings-act-committee-governing-body. "Although not controlling, attorney general opinions are entitled to great weight." *Thurston County v. City of Olympia*, 151 Wn.2d 171, 177, 86 P.3d 151 (2004). This is particularly true where the AGO issues an opinion shortly after the passage of legislation and where the legislature fails to amend the statute in response to the opinion:

> [W]e presume that the legislature is aware of formal opinions issued
> by the attorney general and a failure to amend the statute in response
> to the formal opinion may, in appropriate circumstances, be treated as
> a form of legislative acquiescence in that interpretation. The weight
> of this factor increases over time and decreases where the opinion is

7

For the *Citizens Alliance for Property Rights Legal Fund v. San Juan County,* No. 90500-2areports/.

> inconsistent with previous formal opinions, administrative interpretations, or court opinions. . . . [W]here the opinion is issued in close temporal proximity to the passage of the statute in question, it may shed light on the intent of the legislature, keeping in mind, of course, that the attorney general is a member of a separate branch of government.

*Five Corners Family Farmers v. State,* 173 Wn.2d 296, 308, 268 P.3d 892 (2011) (citations omitted). Here, the AGO issued its opinion construing "committee thereof" and "acts on behalf of" shortly after those terms were added to the definition of "governing body" and the legislature has not amended or clarified the statutory definitions in the three decades since the opinion was issued. Because of these factors and because we find the 1986 AGO opinion persuasive in its reasoning, we adopt the interpretations as set forth in that opinion. *See* 1986 Att'y Gen. Op. No. 16.

The parties also dispute the meaning of "meeting" as applied to the County Council. This dispute focuses on two issues: whether a "meeting" of a governing body requires that a majority of the governing body be present and under what circumstances a serialized sequence of phone calls and e-mails can constitute a "meeting" under the OPMA.

We examine and construe each of the disputed terms in turn.

A. *"Committee thereof"*

A committee of a governing body may itself be a governing body if it is a "committee thereof." The 1986 AGO opinion reasoned that the word "thereof" referred to any committee that the governing body creates:

> The term "thereof" is defined as: "1: of that: of it . . . 2: from that cause: from that particular: Therefrom . . . ." Webster's Third New

8

International Dictionary 2372 (1971). There are two definitions of the word "thereof." The first definition would seem to limit the composition of committees to members of the governing body. However, the second definition includes *any committee the governing body brings into being.*

We find nothing in the language of the Act or its legislative history to indicate that the Legislature intended the more restrictive first definition. Also, the policy of the Act and the legislative declaration that the statute be liberally construed support our application of the broader definition of the word "thereof."

1986 Op. Att'y Gen. No. 16, at 6-7 (emphasis added) (alterations in original).

We agree. Consequently, the key to assessing whether an entity is a "committee thereof" with respect to a particular governing body is not whether the entity's members are members of the governing body but, rather, whether the entity was "created by [the] governing body pursuant to its executive authority . . . ." *Id.* at 5. Thus, a committee may be composed "solely of a minority of the members of the governing body" and even "of nonmembers of the governing body" as long as the governing body created the committee. *Id.* at 6.[1]

B. *"Acts on behalf of"*

The OPMA applies to committees only under certain circumstances— specifically, "when the committee acts on behalf of the governing body, conducts hearings, or takes testimony or public comment." RCW 42.30.020(2). We focus on the meaning of the phrase "acts on behalf of" because CAPR has not alleged that

---

[1] The 1986 AGO opinion does not address the issue of whether a group can be a "committee thereof" with respect to a governing body if the group consists entirely or mostly of a governing body's members but was *not* created or authorized by the governing body as a whole. We need not reach that question in this case because the record shows that the participants in CAO team meetings consisted primarily of nonmembers of the Council.

the CAO Team engaged in any of the other three enumerated activities. Here, we agree with the 1986 AGO opinion that "acts on behalf of" refers to situations where a committee exercises actual or de facto decision-making authority for a governing body. This construction is supported by two fundamental principles of statutory construction: the use of different terms in a statute suggests a different meaning for each term and all language in a statute must be given effect.

"When the legislature uses two different terms in the same statute, courts presume the legislature intends the terms to have different meanings." *Densley v. Dep't of Ret. Sys.*, 162 Wn.2d 210, 219, 173 P.3d 885 (2007). Here, the legislature used different words to describe when *committees* are subject to the OPMA (when the committee "acts on behalf of the governing body") than when it specified that *meetings* are subject to the OPMA (when "action is taken" at the meeting). RCW 42.30.020(2), (4). While the OPMA defines "action" quite broadly, *see* RCW 42.30.020(3), the use of different words in the definition of "governing body" suggests that the legislature intended the phrase "acts on behalf of" to carry a narrower meaning.

Moreover, "'[s]tatutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous.'" *G-P Gypsum Corp. v. Dep't of Revenue*, 169 Wn.2d 304, 309, 237 P.3d 256 (2010) (internal quotation marks omitted) (quoting *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003)). Here, construing "acts on behalf of" as covering all deliberations of a committee would render the remainder of the definition superfluous. As the AGO explained:

10

If the Legislature intended a broad interpretation of the phrase "acts on behalf of," it simply would have added the words "or any committee thereof" to the definition of "governing body." Had the Legislature done so, a committee would have been subject to the Act on the same basis as the governing body itself—whenever it conducts a meeting at which action is taken.

However, the Legislature also added the phrase "when the committee acts on behalf of the governing body, conducts hearings, or takes testimony or public comment." These words would be rendered meaningless if a committee is required to comply with the Act when it holds a meeting where action is taken. Under this language a committee of a governing body is required to comply with the Act only "when the committee acts on behalf of the governing body, conducts hearings, or takes testimony or public comment."

We also note that the Legislature selected the word "acts" instead of the word "action," which is broadly defined in RCW 42.30.020(3). If the Legislature intended the phrase "acts on behalf of" to be broadly construed we believe it would have used the word "action."

1986 Op. Att'y Gen. No. 16, at 9.

As the 1986 AGO opinion acknowledged, while this statutory context strongly suggests that the legislature intended a narrow meaning of "acts on behalf of," the term could also reasonably be construed more broadly as referring to all instances when the committee "performs a specified function in the interest of the governing body." *Id.* at 7. To the extent that a term in a statute is susceptible to more than one reasonable meaning, we may consider the statute's legislative history. *Campbell & Gwinn*, 146 Wn.2d at 12. In this case, however, the legislative history behind the statute leads to the same conclusion: the phrase "acts on behalf of" does not extend to the work of purely advisory bodies.

An early version of the OPMA 1983 amendment would have defined "governing body" as including "any committee thereof if the committee is authorized

11

For the Citizens opinion, go to https://www.lesionari.com/slip-4-ureports/.

to act on behalf of the governing body in conducting hearings, taking testimony or public comment, *or deliberating the making of policy or rules.*" S.B. 3206, at 1-2, 48th Leg., Reg. Sess. (Wash. 1983) (emphasis added). The above-emphasized final phrase was stricken from the definition of a substitute bill, strongly suggesting that the legislature did not intend to extend the OPMA "to committees that do nothing more than deliberate the making of policy or rules." 1986 Op. Att'y Gen. No. 16, at 10. A colloquy on the House floor during the discussion of the amendment further suggests this narrower construction of "acts on behalf of" reflects the intent of the legislature:

> "Mr. Isaacson: 'What are the requirements with respect to giving formal notice?'
>
> "Ms. Hine: 'It's the intent of the legislation, we believe, subject to the deliberations of the governing body, that this apply only to deliberations of the governing body or subcommittees which the governing body specifically authorizes to act on its behalf, or which [sic] policy, testimony, or comments are made in its behalf. In Other Words, It's When Making Policy Or Rules, Not For General Comments Or Any Kind Of Informal Type Meeting They May Have. Those would not require the official formal notice.'"

*Id.* at 11 (quoting 1 HOUSE JOURNAL, 48th Leg., Reg. Sess., at 1294 (Wash. 1983)). Taking the plain meaning of the statute together with this legislative history, the AGO concluded that "a committee acts on behalf of the governing body when it exercises actual or de facto decisionmaking authority for the governing body." *Id.* at 8. We agree and adopt the AGO's construction of "acts on behalf of" as set forth in its 1986 AGO opinion. The OPMA therefore does not extend to advisory committees and other entities that do nothing more than conduct internal discussions and provide advice or information to the governing body.

12

C. *"Meeting"*

OPMA also specifies when meetings are subject to the OPMA—when "action is taken" at a meeting. RCW 42.30.020(4). Our case law also establishes that the OPMA applies only to meetings where a majority of the governing body is present. *In re Recall of Beasley,* 128 Wn.2d 419, 427, 908 P.2d 878 (1996) (citing *In re Recall of Roberts,* 115 Wn.2d 551, 554, 799 P.2d 734 (1990)); *Wood v. Battle Ground Sch. Dist.,* 107 Wn. App. 550, 564, 27 P.3d 1208 (2001). Gatherings that do not include a majority of the governing body's members are not considered meetings for the purposes of the OPMA.

Unfortunately, the OPMA does not actually define what a "meeting" itself is, and neither this court nor the AGO has construed "meeting" in an opinion. To construe this term, we start by examining its plain and ordinary meaning. *State v. Kintz,* 169 Wn.2d 537, 547, 238 P.3d 470 (2010). While we typically ascertain plain meaning from standard English dictionaries, it is helpful to examine legal dictionaries when words are used in a legal context. *Lynott v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 123 Wn.2d 678, 691-92, 871 P.2d 146 (1994). Here, *Black's Law Dictionary* provides a useful definition of "meeting" in the context of legislative and deliberative bodies:

> **meeting,** *n.* (14c) *Parliamentary law.* A single official gathering of people to discuss or act on matters in which they have a common interest; esp., the convening of a deliberative assembly to transact business. • A deliberative assembly's meeting begins with a call to order and continues (aside from recesses) until the assembly adjourns.

BLACK'S LAW DICTIONARY 1131 (10th ed. 2014).

13

For a gathering to be considered a "meeting," then, the purpose of the gathering must be "to discuss or act on matters in which" the attendees "have a common interest." *Id.* It follows that for a gathering of a governing body's members to be considered a "meeting" of the governing body itself, the "common interest" must relate to the official business of the governing body. Consequently, and as our courts have held, members of a governing body "must *collectively intend to meet* to transact the governing body's official business" for their communications to constitute a meeting. *Wood*, 107 Wn. App. at 565 (emphasis added) (citing 1971 Op. Att'y Gen. No. 33, at 19). As the Court of Appeals correctly held, the passive receipt of e-mails and other one-way forms of communication does not, by itself, amount to participation in a meeting because such passive receipt of information does not demonstrate the necessary intent to meet. *See Citizens All.*, 181 Wn. App. at 545 (citing *Wood*, 107 Wn. App. at 564). If communications do not reflect the requisite collective intent to meet, no "meeting" has occurred and the OPMA does not apply.

Thus, within the context of the OPMA, we adopt the following definitions: (1) a "meeting" of a governing body occurs when a majority of its members gathers with the collective intent of transacting the governing body's business, (2) a "committee thereof" with respect to a given governing body is an entity that the governing body created or specifically authorized, and (3) a committee "acts on behalf of" a governing body when the committee exercises actual or de facto decision-making authority on behalf of the governing body. Thus, to establish that the CAO Team violated the OPMA, CAPR must establish that an issue of fact exists

14

regarding whether (A) a majority of council members participated in a CAO team meeting with the collective intent of transacting the Council's business, *or* (B) the CAO Team was created by the Council *and* (C) that it exercised decision-making authority on behalf of the Council.[2]

## II. The CAO team meetings were not subject to the OPMA

Here, the CAO team meetings did not violate the OPMA because (A) none of the CAO team meetings included a majority of council members, (B) the team was not a "committee" of the Council, and (C) the team did not "act on behalf of" the Council.

### A. No majority of the Council

CAPR argues that the CAO team meetings constituted meetings of the Council itself because they included a "quorum" of the Council's members. In support of this argument, CAPR asserts that the OPMA applies to meetings in which a "'negative quorum'" of the Council's members participate—i.e., a number of Council members sufficient to *block* legislation being considered by the Council, even if that number is not sufficient to *enact* legislation. Am. Pet. for Review at 8. CAPR further alleges that one series of e-mails and telephone conversations constituted a "meeting" of the Council that included an actual majority of the

---

[2] CAPR attempts to argue that these requirements are disjunctive—i.e., that a committee is a "governing body" under the OPMA if it was created by the council *or* if it acted on behalf of the council. But the "committee thereof" and "acts on behalf of" requirements are clearly separate under the plain language of the statute, which makes a "committee thereof" subject to the OPMA only "*when* the committee acts on behalf of the governing body . . . ." RCW 42.30.020(2) (emphasis added). An entity thus must meet both requirements to be subject to the OPMA.

Council's members. We reject the former argument because it runs contrary to our long-standing precedent requiring the presence of a majority of a governing body's members for a gathering to trigger the requirements of the OPMA. We also reject the latter argument because the record does not indicate that a majority of council members had a collective intent to meet during the e-mail and telephone exchange that CAPR cites.

The Council had six members during the relevant period. The CAO Team initially included two members of the Council (Fralick and Pratt), and a third member (Miller) began attending the meetings later. While formal attendance records do not appear to have been kept for the team's meetings, we assume arguendo that all three of these council members attended all CAO team meetings that occurred after Miller joined the Council. Under Washington Law, the OPMA applies to a gathering of a governing body's members only if a majority of members are present. *See In re Recall of Beasley*, 128 Wn.2d at 427. Applying this standard, the CAO team meetings did not trigger the OPMA because three members of the Council is one less than a majority.

CAPR argues, however, that we should depart from this precedent and hold that the presence of a "negative quorum" of a governing body's members suffices to trigger the OPMA. A negative quorum refers to the situation where the number of members present would be sufficient to block the passage of legislation. CAPR

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

cites no Washington case that utilizes the negative quorum principle, instead relying on a single out-of-state opinion published nearly three decades ago.[3]

We see no reason to depart from our long-standing rule requiring the presence of a simple majority of a governing body's members—a rule that provides clear guidance to public agencies regarding the application of the OPMA. It is easy to determine whether a majority of a governing body's members are present at a meeting. On the other hand, it might be difficult to apply a "negative quorum" rule because different measures being discussed by a governing body might require the approval of different numbers of members (e.g., some measures might require a simple majority and others a two-thirds supermajority) for passage.[4] We decline to overturn our prior precedent and instead reaffirm that the OPMA applies to meetings of a governing body when a majority of the governing body's members are present.

CAPR does not dispute that all of the CAO Team's in-person meetings included at most three members of the Council. Consequently, none of the in-person CAO team meetings constituted a meeting of the Council itself for the purposes of the OPMA. But CAPR asserts that a serialized e-mail and telephone exchange involving members of the Council constituted a "meeting" of the Council

---

[3] *See State ex rel. Newspapers Inc. v. Showers*, 135 Wis. 2d 77, 80, 398 N.W.2d 154 (1987) (Wisconsin open meeting law applied to a gathering of 4 members of an 11-member body to discuss a budget measure that required a two-thirds supermajority to pass).

[4] In fact, if a measure required unanimous approval for passage, then the presence of a single member of the governing body would technically constitute a negative quorum with respect to that measure.

because four council members were "present" during the communications. *See* Suppl. Br. of Appellant at 7-8. The communications that CAPR describes as a "meeting" consisted of two e-mails and a telephone call that occurred over the course of a 14-hour period. Council member Peterson, who did not attend any of the CAO Team's in-person meetings, sent the first e-mail on which CAPR relies; the recipients were Fralick and Miller, who were on the CAO Team. Fralick responded to Peterson later the same day, copying Miller. In his e-mail, Fralick alluded to a telephone call between himself and Pratt (another CAO team member) that apparently had occurred earlier in the same day. Both the e-mails and Fralick's summary of the telephone call reference the CAO update.

These communications did not constitute a meeting of the Council because they contain no indication that the participants had the requisite collective intent to meet. *See Wood,* 107 Wn. App. at 565 ("the participants must collectively intend to meet to transact the governing body's official business" for the OPMA to apply (citing 1971 Op. Att'y Gen. No. 33)). The text of the e-mails do not indicate that Miller or Peterson were aware of Fralick's call to Pratt before Fralick sent his e-mail summarizing it; certainly, the e-mails do not suggest that Miller or Peterson actually intended for a telephone call to Pratt to be part of an otherwise e-mail-based "meeting" of the Council. Likewise, there is no indication that Pratt was aware of the e-mails sent by Peterson or Fralick. Consequently, the communications cited by CAPR do not evidence a collective intent for the four council members to meet to transact council business.

Moreover, the record does not contain any e-mails sent by Miller in this exchange, nor does it reference any telephone calls in which Miller participated. Instead, Miller passively received one e-mail each from Fralick and Peterson. Because passive receipt of e-mail does not constitute participation in a meeting, *Wood*, 107 Wn. App. at 564, Miller could not have been part of the ostensible "meeting" for OPMA purposes. Without Miller, the communications at issue involve only three council members—the same number that participated on the CAO Team and less than a majority of the full Council. For these reasons, the e-mail/telephone exchange did not constitute a "meeting" of the Council.[5]

Because CAPR cites to no meetings or communications of the CAO Team involving more than three council members and because we reject CAPR's "negative quorum" argument, CAPR has failed to establish that the CAO team meetings constituted meetings of the Council.

### B. Not a committee of the Council and no action on behalf of the Council

The fact that CAO team meetings were not meetings of the Council itself does not end the OPMA inquiry because the OPMA also applies to committees and subcommittees of legislative bodies under certain circumstances:

> (2) "Governing body" means the multimember . . . council, or other policy or rule-making body of a public agency, or any *committee thereof* when the committee *acts on behalf of* the governing body, conducts hearings, or takes testimony or public comment.

---

[5] We do not reach the issue of whether such a serialized sequence of communications can ever constitute a "meeting" under OPMA.

RCW 42.30.020 (emphasis added). Here, CAPR has not alleged that the CAO Team conducted hearings or took testimony or public comment. Thus, for the CAO Team to be subject to the OPMA, it must satisfy two conditions: (1) it must be a "committee thereof" with respect to the Council and (2) it must have "acted on behalf" of the Council.

The CAO Team does not meet either of these requirements. CAPR failed to create an issue of fact whether the team was a committee of the Council because CAPR failed to offer any evidence that the Council authorized the creation of the CAO Team. Moreover, the CAO Team never "acted on behalf of" the Council because the record contains no indication that the CAO Team exercised actual or de facto decision-making power. Rather, all evidence adduced by CAPR suggests that the CAO Team's role with respect to the Council was, at most, that of staff support.

1. The CAO Team was not a "committee thereof" with respect to the Council

We apply the 1986 AGO opinion's construction of "committee thereof," under which the CAO Team can be considered a committee of the Council only if the Council somehow acted to bring the CAO Team into being. 1986 Op. Att'y Gen. No. 16, at 7. None of the voluminous documents that CAPR obtained during discovery and cited in its court filings suggest that the Council took any such action. All six individuals who were members of the Council during the CAO update process filed declarations before the trial court stating individually that they took no action as a council member to bring the CAO Team into being, never intended to bring it into being, never authorized the CAO Team to act for the Council, and never intended

20

for the CAO Team to act for the Council. CAPR failed to adduce any evidence disputing these unequivocal statements that the Council did not create the CAO Team,[6] nor have they cited to any documents in the record suggesting that the Council later ratified the CAO Team's formation.

The concurrence/dissent argues that the CAO Team was created by the Council because "[i]t was the Council, not the county administrator, that determined it needed an updated participation plan in order to fulfill its mandatory duty to update its critical areas ordinance using best available science." Concurrence/Dissent at 6. This is a non sequitur. When a governing body directs its staff to develop a plan of action and the staff creates a committee to develop the plan, the staff, not the governing body, has created the committee. That is the nature of organizations: the governing body decides on policy and orders the staff to implement the policy, and the staff complies. If the concurrence/dissent's theory were correct, every staff department would be a committee of the governing agency and would be subject to the OPMA. This cannot have been the intent of the act.

For these reasons, the CAO Team was not a "committee thereof" with respect to the Council.[7]

---

[6] In its response to the summary judgment motion, CAPR cited to a single deposition statement by another county employee who was a member of the CAO Team opining that the Council "would have created" the CAO Team. The trial court correctly struck this statement as speculation because the deposition did not suggest that the employee had any personal knowledge of how the CAO Team was created; CAPR did not challenge this decision in its petition for review or supplemental brief.

[7] On appeal, CAPR has argued that meetings of other council subcommittees—specifically governance, budget, and solid waste subcommittees—also held closed meetings in violation of OPMA. *See* Am. Pet. for Review at 4-5. The Court of Appeals rejected CAPR's

### 2. The CAO Team did not "act on behalf of" the Council

Even if we were to conclude that the CAO Team was a "committee" of the Council, CAPR's claim would fail because the CAO Team did not act on behalf of the Council. Applying the 1986 AGO opinion's definition, CAPR must demonstrate that the CAO Team exercised actual or de facto decision-making authority for the Council to establish that the team acted "on behalf of" the Council. *See* 1986 Att'y Gen. Op. No. 16, at 8. The record contains no indication that the CAO Team ever exercised such authority.

The record demonstrates that the CAO Team's role with respect to the Council was, at most, that of staff or an advisory board. The CAO Team appears to have spent much of its time discussing procedural and logistical issues such as the timeline for completing the update, the formatting of reports, the scheduling of public comment sessions, and gathering information from outside consultants and experts. Other topics discussed included public messaging and anticipating and responding to potential objections to the update. To the extent that the team addressed the substance of the CAO update, nothing in the record indicates that they did anything more than gather information, conduct internal discussions, and provide information to the Council. As the 1986 AGO opinion suggests and as the

---

argument with respect to these other subcommittees, noting that while "CAPR made some passing references to the other subcommittees in its amended complaint and response to the County's motion for summary judgment[, it] did not name those subcommittees as defendants, include them in its claim for relief, or provide evidence and argument in support of its assertion that they violated OPMA." *Citizens All.*, 181 Wn. App. at 542 n.4. We agree and therefore do not consider CAPR's arguments concerning other subcommittees.

Court of Appeals held, none of these activities amount to the exercise of actual or de facto decision-making authority. Rather, they are consistent with the role of an informal advisory committee or administrative staff support. *See id.* at 11-12; *Citizens All.*, 181 Wn. App. at 551-52.

The concurrence/dissent selectively seizes on part of a definition of the word "act" or "acts" from 1986 AGO opinion, using "exert[s] power or influence or produce[s] an effect" to define "acts." Concurrence/dissent at 8. But this ignores the AGO's express qualification that the committee must be acting "on behalf" of the governing body: "Under this construction, a committee acts on behalf of the governing body when its exercises actual or de facto decisionmaking authority for the governing body." 1986 Op. Att'y Gen. No. 16, at 5.

The concurrence/dissent seems to conclude that a committee might be subject to the OPMA if the committee exerts power or influence, concluding that the CAO Team might have exercised power or influence because "it played a key role in formulating the best available science synthesis adopted by the Council." Concurrence/Dissent at 9. This theory is internally inconsistent, as the CAO Team could not have been acting on behalf of the Council by making a recommendation to the Council itself; particularly where the Council, not the CAO Team, was deciding what would constitute the best available science.

The concurrence/dissent's focus on the exercise of power and producing an effect results in a vague definition of when a committee acts on behalf of the governing body, which the concurrence/dissent characterizes as "nuanced." *Id.* at 7. As a result, three years after the CAO Team completed its work, after

23

proceedings in three levels of court, and despite a summary judgment record exceeding 1,000 pages, the concurrence/dissent concludes that we still do not know if the CAO Team acted "on behalf" of the Council. This lack of clarity places government units in the untenable position of not knowing until long after the fact whether any committee is subject to the OPMA. State and local governments need a clear definition, not a nuanced definition. We adhere to the clear and workable definition that a committee acts on behalf of a governing body only when the committee exercises actual or de facto decision-making authority for a governing body.

Consequently, the CAO Team did not act on behalf of the Council. The team's meetings therefore cannot constitute meetings of a "governing body" under RCW 42.30.020(2).

III.     Attorney fees

CAPR asserts that it would be entitled to reasonable attorney fees and costs under the OPMA if we reverse the Court of Appeals and hold that the County violated the OPMA. Because we affirm and hold that no the OPMA violation occurred, we deny CAPR's request for attorney fees.

CONCLUSION

For these reasons, we affirm.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Wiggins, J.

WE CONCUR.

Madsen, C.J.

Gonzáles, J.

Owens, J.

Geo. McCol, J.

Fairhurst, J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 90500-2

YU, J. (concurring in part and dissenting in part)—"All political power is inherent in the people, and governments derive their just powers from the consent of the governed." CONST. art. I, § 1. In order to give meaning and substance to this consent, the Open Public Meetings Act of 1971 (OPMA) helps to ensure that the people "may retain control over the instruments they have created." RCW 42.30.010. I agree with the majority that the attorney general has provided highly persuasive guidance for interpreting the OPMA. Given the context and nuances of this guidance, however, I cannot agree with all of the majority's conclusions. I would hold that the Citizens Alliance for Property Rights Legal Fund (CAPR) has shown, as a matter of law, that the critical areas ordinance team (CAO Team) was a committee of the San Juan County Council (Council) and that CAPR has produced sufficient evidence to create a genuine issue of material fact as to

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

whether and when the CAO Team acted on the Council's behalf. I therefore respectfully dissent in part.[1]

## ANALYSIS

It is undisputed the CAO Team held meetings that would have violated the OPMA, if the OPMA applied. I agree with the majority that the OPMA applied to those meetings only *if* the CAO Team was a committee of the Council and only *when* it acted on the Council's behalf. *See* majority at 15 & n.2. However, I would hold CAPR has produced sufficient evidence to survive summary judgment because the CAO Team was a committee of the Council as a matter of law and there is a genuine issue of fact as to whether it acted on the Council's behalf.

### A. The CAO Team was a committee of the Council

The OPMA applies to governing bodies of public agencies, such as the Council, and to "any committee thereof." RCW 42.30.020(2). The CAO Team was certainly a "committee"—"'a body of persons delegated to consider, investigate, or take action upon and usu. to report concerning some matter of business.'" 1986 Op. Att'y Gen. No. 16, at 6 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 458 (1971)). The question is what the CAO Team

---

[1] I agree that CAPR has not produced sufficient evidence to survive summary judgment on the question of whether the Council as a whole violated the OPMA. I also agree that we should not consider its arguments regarding any committees other than the CAO Team. Finally, I agree with the necessarily implied conclusion that, even if the CAO Team did violate the OPMA, the ordinances at issue in this case are not void under RCW 42.30.060(1). I therefore concur in part.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

was a committee *of*, and based on the facts presented, I would hold that it was a committee of the Council.

In 1986, the attorney general issued a formal opinion determining that a committee of a governing body could include "committees composed of nonmembers of the governing body when appointed by the governing body." *Id.* at 2. The OPMA's coverage "includes any committee the governing body brings into being" because in this context, "thereof" is broadly defined as "'from that cause: from that particular.'" *Id.* at 6-7 (quoting WEBSTER'S, *supra*, at 2372). This coverage is not limited to committees brought into being "though a formal legal instrument such as a legislative resolution or an executive directive." Majority at 2-3. Quite the contrary.

In fact, the OPMA was amended to fill a "gap in the coverage" for "committees, subcommittees, and other groups that were not created by or pursuant to statute, ordinance, or other legislative act." 1986 Op. Att'y Gen. No. 16, at 4. Holding that the OPMA does not apply to committees unless they are created by a formal legal instrument reopens a statutory gap that has been closed for nearly 30 years. "'The unavoidable fact is that each new arrangement must be examined anew and in its own context.'" 1991 Op. Att'y Gen. No. 5, at 5 (quoting *Pub. Citizen Health Research Grp. v. Dep't of Health, Educ. & Welfare*, 215 U.S. App. D.C. 191, 668 F.2d 537, 542 (1981)). As eloquently stated in an informal opinion

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

by the attorney general's open government ombudsman, "Whether the committee was created directly or indirectly by the [governing body] is of less relevance than how it functions as a committee." Clerk's Papers (CP) at 695; *cf. Worthington v. WestNET*, 182 Wn.2d 500, 507-08, 341 P.3d 995 (2015) (endorsing a functional approach to analyzing when an entity is a public agency subject to the Public Records Act, chapter 42.56 RCW). There is certainly nothing in the record to show that the Council specifically created the CAO Team with a formal legal instrument, but the relevant inquiry is the context in which the CAO Team was created and not merely the formalities of how it was done. Nothing about the OPMA endorses the view that informality is an adequate substitute for open government.

The record indicates that the specific idea to form a CAO Team came from the county administrator, CP at 254, 761-69, and the CAO Team was originally brought together by a joint effort of its members, which included members of the Council as well as other individuals, SAN JUAN COUNTY RESOLUTION (SJCR) 26-2010, at 3 (June 29, 2010).[2] Those actions, by themselves, probably would not make the CAO Team a committee of the Council. Generally speaking, a group may come together on its own initiative to discuss ideas and formulate suggested

---

[2]The county has acknowledged that we may take judicial notice of this resolution, as well as SJCR 12-2010 (Feb. 16, 2010) and SJCR 32-2011 (Aug. 9, 2011). *See* Resp't's Answer to Mot. to Augment R. after Oral Arg. at 3-4.

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

approaches to government policy without being a committee of that government. But that is not all that happened here.

The CAO Team was formed because the Council had already tried and failed twice to update the county's critical areas ordinance. *See, e.g.*, CP at 254-55, 290, 320, 384. By statute, this update was mandatory and required "the best available science in developing policies and development regulations to protect the functions and values of critical areas." SCJR 12-2010, at 1 (Feb. 16, 2010) (citing RCW 36.70A.130, .172). A problem arose in the Council's prior update attempts when "the San Juan County Planners and a citizens advisory committee" used incomplete reports "to prepare a draft critical areas ordinance before the best available science was approved by the County Council." *Id.*

Based on this prior experience, the Council determined in February 2010 that it needed to "revise its process for consideration of best available science in the adoption of its critical areas regulations." *Id.* The Council directed the planning department to draft "a revised public participation plan with a schedule for the review, and if necessary, revision of" the critical areas ordinance. *Id.* at 2. The Council provided specific directions about what the public participation plan should look like: "The first step of the public participation process will be to identify the best available science that will be relied upon," which should include opportunities for submissions and comments by the public. *Id.*

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Approximately four months after the Council determined it needed a revised participation plan, it formally adopted one. The first step of that plan reads, "Establish CAO Update Implementation Team." SJCR 26-2010, at 3 (boldface omitted). The CAO Team was designated as solely responsible for "[d]etermin[ing] content and format of science syntheses, evaluation of reg[ulations] and recommendations." *Id.* at 5. In August 2011, the Council passed a resolution updating and replacing the earlier plan. The first task was listed as "Establish [critical areas ordinance/shoreline master program] Update Implementation Team." SJCR 32-2011, Ex. A at 1. The CAO Team was designated as the party solely responsible for having completed the task of "[d]etermin[ing] content and format of science syntheses." *Id.* at 3.

This context cannot be ignored. It was the Council, not the county administrator, that determined it needed an updated participation plan in order to fulfill its mandatory duty to update its critical areas ordinance using best available science. The Council passed a formal resolution ratifying the CAO Team's role in that plan. Unlike an outside group, such as a citizens' committee, the CAO Team was not merely given an opportunity to provide input—it was delegated specific, essential tasks, without which the Council "wouldn't have made any progress." CP at 230. Its task was not merely to develop a plan for synthesizing best available science but to actually formulate that synthesis, which required discarding specific

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

approaches. And unlike many other parties with designated roles in the participation plan (for example, the Department of Commerce and the county prosecuting attorney), the CAO Team did not exist before or after the Council's ordinance update process. The Council is the entity that brought the CAO Team into being, and the CAO Team was therefore a committee of the Council.

B.     There is a genuine issue of material fact as to whether the CAO Team acted on the Council's behalf

I agree with the majority that just because an entity is a committee of a governing body does not mean all its meetings are subject to the OPMA. As applied to this case, the OPMA applies only when the committee "acts on behalf of the governing body." RCW 42.30.020(2). Contrary to the majority's summary conclusions, I believe there is a genuine issue of fact as to whether the CAO Team did so.

1.     The attorney general's guidance must be read in context

The attorney general determined that "a committee acts on behalf of the governing body when its exercises actual or de facto decisionmaking authority for the governing body." 1986 Op. Att'y Gen. No. 16, at 8. This guidance is both persuasive and relevant, but it is also more nuanced than that single phrase conveys.

"[A] committee might act on behalf of the governing body only when it exerts power or influence or produces an effect as the representative of the

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

governing body." *Id.* at 7. To exert power or influence or produce an effect as the governing body's representative, a committee must do more than merely discuss an issue. As the attorney general has noted, if that were sufficient, committee meetings would be subject to the OPMA to the same extent as meetings of the governing body. *Id.* at 9. On the evidence presented, many of the CAO Team's activities probably did not rise to the level of acting on behalf of the Council under the definition adopted by the attorney general.

However, a committee's activities certainly do not need not take the form of "final action" as defined in RCW 42.30.020(3) ("[A] collective positive or negative decision, or an actual vote by a majority of the members of a governing body when sitting as a body or entity, upon a motion, proposal, resolution, order, or ordinance."). If that were necessary, the committee would have to usurp the final decision-making authority of the governing body before the OPMA could apply. Such an interpretation is easy to apply in practice but is irreconcilable with the OPMA's broad statement of legislative purpose:

> The legislature finds and declares that all . . . councils, committees, subcommittees, . . . and all other public agencies of this state and subdivisions thereof exist to aid in the conduct of the people's business. It is the intent of this chapter that their actions be taken openly and that their deliberations be conducted openly.

RCW 42.30.010.

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The attorney general's full definition captures the appropriate middle ground on which we should analyze whether and when the CAO Team acted on behalf of the Council—whenever it "exert[ed] power or influence or produce[d] an effect as the representative of the governing body." 1986 Op. Att'y Gen. 16, at 8. I would hold that the evidence presented indicates that at least some of the CAO Team's activities might have met this definition.

> 2. There is a genuine issue of material fact about whether the CAO Team acted on behalf of the Council

Our ability to evaluate what the CAO Team did at any particular meeting is hampered by the fact that its meetings were not recorded or transcribed and that CAO team members generally stated they did not recall the specific events of any particular meeting or the specific discussions held on any particular topic.[3] *E.g.*, CP at 258, 267, 367, 385-86. This lack of documentation and institutional amnesia only emphasizes the importance of public oversight under the OPMA. Nevertheless, there is sufficient evidence to create a genuine issue of material fact. We know the CAO Team met over 20 times, and we know it played a key role in formulating the best available science synthesis adopted by the Council. The full extent and influence of this role is a question of fact.

---

[3] Whether these assertions are credible is, of course, a question for the finder of fact.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

While official documents relevant to this question are scarce, some are illuminating. The Council's own resolutions designate the CAO Team as solely responsible for "[d]etermin[ing] content and format of science syntheses." SJCR 26-2010, at 5; SJCR 32-2011, Ex. A at 3. Determining the format of science syntheses is unlikely to exert power or influence or create any substantive effect on the Council's behalf, but determining its content certainly would. I do not believe that at the summary judgment stage, this can be dismissed as mere unartful wording. The county's prosecuting attorney indicated that in council committees, "ideas and policies are brought forward, discussed, narrowed and discarded and approaches are formulated for making presentations of subcommittee work to the entire Council." CP at 453. Simply bringing forth and discussing ideas and policies is not acting on the Council's behalf, but narrowing and discarding them might be.

Indeed, members of the Council indicated that this narrowing and discarding process might include deciding how much of the information underlying its recommendations, if any, should be provided to the full Council or to the public. For instance, the Council held a special public meeting on January 31, 2012 to discuss "issues associated with the role of subcommittees." *Id.* at 228. Many statements by the council members themselves indicate that neither the Council nor the public was given access to the information underlying committee

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

recommendations or even provided with a summary of the committee's discussions in reaching its recommendations. One council member stated that there was a "challenge" presented by the fact that "like the public, those council members who aren't on the subcommittee aren't privy to all of the information and all of the discussion that went into the formation of a recommendation." *Id.* at 229. Later in the same meeting, a council member who was speaking from the perspective of someone "[h]aving only dealt with this system for a year" raised the CAO Team as an example of a "subcommittee" whose members "would have more knowledge than the rest of the council."[4] *Id.* at 230. A third council member freely acknowledged that committee members might tell the rest of the Council they have nothing to report from committee, not because nothing happened but

> because I was there and lived it, but am I being fair to the rest of the council by not providing some of the background of the nature of the dialogue?
> ... We can't sit down and have the whole conversation with you that we had in the subcommittee, but I don't see any reason why the documents couldn't be made more readily available so you have them and you have a chance to digest them.

---

[4]Other council members who were part of the CAO Team quickly jumped in to make it clear they did not view the CAO Team as a subcommittee "because it actually has staff and other people involved," CP at 230, but the attorney general's 1986 opinion makes it clear that an entity's membership is not determinative of whether it is a committee of a governing body. This candid statement from a council member looking at the CAO Team from an outside perspective is telling as to the actual function of the CAO Team relative to the Council as a whole.

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Id.* at 232. And a fourth member noted that when the full Council was "in an agenda crunch," reports from subcommittees "are usually one of the things that goes first" and are most likely to be treated "as throwaways." *Id.* at 232.

Unofficial records created by CAO team members further indicate that the CAO Team considered more information than it provided to the Council or the public in the process of crafting the best available science synthesis. Particularly in light of the central importance of best available science to the Council's mandatory duty to update its critical areas ordinance, this issue warrants careful scrutiny. Using the best available science is not simply good policy; it *must* be considered "in developing policies and development regulations to protect the functions and values of critical areas." SJCR 12-2010 at 1.

One of the CAO Team's duties regarding the best available science synthesis was "identifying for the County Council its view of what policy decisions had to be made by the County Council." CP at 445. This provided a "starting point" for determining what issues the Council should even look at. *Id.* at 446. It should go without saying that identifying the issues that must be decided is very likely to produce an effect on the decisions that are made. Particularly in light of the fact that the majority of the Council agreed in 2012 that its committees often did not provide it with the information underlying its decisions, I would hold there is a

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

genuine question of fact as to whether identifying issues rose to the level of acting on behalf of the Council.

A member of the CAO Team who was not on the Council also indicated that the CAO Team's duties included making suggestions for explaining the scientific information "in a way that normal people can understand." *Id.* at 401. Whether the CAO Team considered that an issue of determining the "content" of the best available science synthesis or merely its "format," the "normal" people should be able to see the underlying information that is being explained. It is not clear from the record whether and to what extent they were able to access that information, and there is a genuine issue of material fact as to the level of influence this may have had.

It also appears there was an ongoing question about whether a scientific expert contracted by the county was in fact providing the best available science. In November 2011, a member of the CAO Team wrote an e-mail to the rest of the CAO Team about this expert:

> At some point soon we do need to discuss Dr. Adamus' role moving forward. While he can be quite helpful, it is a problem if he doesn't have time to attend hearings (which we have not asked him to do but which would help him understand the comments we receive), review materials, and participate in problem solving in a constructive manner. His lack of attention and input into the last wetland draft resulted in a significant waste of both our time, and the public's time.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Id.* at 517. Several months later, these problems had only become worse. In an e-mail message to the rest of the CAO Team, the same team member lamented, "We are continuing to struggle with the crafting of a site specific approach to buffers that is understandable, workable and scientifically defensible—and the more I work with the various versions of Dr. Adamus' approaches the more concerned I become." *Id.* at 503. After listing various problems with the substance of the expert's recommendations, she concluded that it was unlikely the CAO Team would be able "to go forward with one approach we both understand and support," which "is an odd situation for a client and contractor." *Id.* at 504.

Members of the CAO Team stated they could not remember what happened in response to this e-mail. *Id.* at 336-41, 414-15. However, I find it troubling that a member of the CAO Team would suggest it was appropriate for the CAO Team, rather than the full Council, to determine "how to proceed" regarding this substantive conflict without public oversight. *Id.* at 504. The public has a right to see more than just an alternative to the expert's recommendations—it has a right to know when its money is being spent on the services of an expert whose recommendations might include major substantive flaws based on the expert's inability to "participate in problem solving in a constructive manner." *Id.* at 517. And if the county spent its limited funds on an expert whose contributions were ill-informed or unsupportable, it is a reasonable inference that the county had less

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

money to spend on someone who would do the job well, exerting influence over the Council's ultimate decisions.

If the Council had decided that some of the information it solicited, gathered, and paid for with public funds was not sufficiently important, persuasive, or probative enough to warrant consideration in formulating its policy decisions, it would be exercising its actual decision-making authority. If, as the record indicates, the CAO Team made such a decision without the Council's input, it exercised decision-making authority on the Council's behalf. Depending on the circumstances, such a decision could very well exert power or influence or produce an effect on a governing body's entire decision-making process.[5]

Allowing such decisions to occur behind closed doors is directly contrary to one of the OPMA's fundamental principles: "The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know." RCW 42.30.010. In the words of one council member, "[i]f they want to watch the sausage grinding, . . . they have every right to witness the decision-making process and all the discussion that goes

_____

[5]This interpretation is fully consistent with the other activities that might subject a committee meeting to the OPMA's requirements—"conduct[ing] hearings, or tak[ing] testimony or public comment." RCW 42.30.020(2). The public clearly has a right to know the underlying information a committee considered if that information is presented orally. I cannot read the OPMA as granting a committee license to decide, on behalf of a governing body and behind closed doors, whether the public has a right to know about information presented in writing.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

into arriving at whatever ordinance or resolution or whatever outcome we arrive

at." CP at 229.

## CONCLUSION

The CAO Team was certainly a committee of the Council, and it may have

acted on the Council's behalf. I therefore respectfully dissent from the majority's

conclusion that the OPMA does not apply to the CAO Team as a matter of law.

16

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Citizens All. for Prop. Rights Legal Fund v. San Juan County, et al.*, No. 90500-2
Yu, J. (concurring in part and dissenting in part)

17