IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JAMES EGAN, individually, | ) | No. 79920-7-I |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| CITY OF SEATTLE, a Washington | ) | |
| municipal corporation, | ) | DIVISION ONE |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| ARTHUR WEST, | ) | |
| | ) | |
| Appellant, | ) | PUBLISHED OPINION |
| | ) | |
| v. | ) | |
| | ) | |
| SEATTLE CITY COUNCIL, CITY OF | ) | |
| SEATTLE, LISA HERBOLD, BRUCE | ) | |
| HARRELL, KSHAMA SAWANT, ROB | ) | |
| JOHNSON, DEBORA JUAREZ, MIKE | ) | |
| O'BRIEN, SALLY BAGSHAW, TERESA | ) | |
| MOSQUEDA, LORENA GONZALEZ, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

ANDRUS, A.C.J. — Arthur West challenges the summary judgment dismissal of his complaint alleging that members of the Seattle City Council violated the Open Public Meetings Act[1] (OPMA) when they repealed the Employee Hour Tax

---

[1] Ch. 42.30 RCW.

(EHT). He argues the council members' communications regarding possible repeal of the tax constituted collective intent to transact official business outside of a public meeting. We conclude the record shows genuine issues of material fact. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

FACTS

A. Employee Hour Tax

On May 14, 2018, the Seattle City Council passed an ordinance establishing an annual tax of $275 per full time employee on the City's largest businesses (Employee Hour Tax or EHT). Four council members acted as primary sponsors for the legislation—Lisa Herbold, Lorena González, Teresa Mosqueda, and Mike O'Brien.

Shortly after the EHT's passage, polls revealed strong opposition to the legislation. A committee named No Tax on Jobs formed to support a referendum to repeal the ordinance. It immediately began collecting signatures to qualify the referendum for the November 2018 ballot.

Several weeks later, EMC Research invited O'Brien, Herbold, González, and Mosqueda, as well as community representatives, to participate in a telephone conference call to discuss the results of polling it had conducted relating to the EHT ordinance. The call was scheduled for Saturday, June 9, 2018. The events during and after this conference call gave rise to this suit.

B. Events from June 9, 2018 to Repeal of the EHT on June 12, 2018

1. Saturday, June 9, 2018

Herbold, O'Brien, and Mosqueda attended the June 9th call. González, who was in Washington, D.C. that weekend, also participated for a short time. Seattle Senior Deputy Mayor Mike Fong and Deputy Mayor Shefali Ranganathan, representatives of Mayor Jenny Durkan, participated in the conference call as well.

During the course of this call, a participant—not an employee of the City—suggested the possibility of a legislative repeal of the EHT. Herbold spoke in favor of considering such a repeal. After the call ended, Herbold and O'Brien discussed the polling results, their concerns about the anticipated referendum to repeal the EHT, and the challenges they believed they would face in opposing the referendum.

O'Brien also spoke to Mosqueda, separately, about the poll results. Mosqueda indicated she favored continuing a political campaign to support the EHT and would not support a potential repeal of the tax, even if it was politically unpopular, unless there was suitable replacement legislation. O'Brien indicated he understood her reasoning but also expressed his concern about the poll results, the likely referendum to repeal the EHT, and the related political fight.

O'Brien then spoke with Deputy Mayor Ranganathan. They discussed their reactions to the polling results and their concerns about the referendum. Then around 6:00 p.m. that evening, Deputy Mayor Fong sent O'Brien information for a conference call with Mayor Durkan for the following day, before she returned from the U.S. Conference of Mayors in Boston, Massachusetts.

2. Sunday, June 10, 2018

The next day, Sunday, June 10, Mayor Durkan's staff called or texted most of the council members in an effort to determine how many of them would support a repeal. O'Brien and the Mayor's staff continued to arrange for the two to speak that afternoon. When speaking with O'Brien, Deputy Mayor Fong indicated Mayor Durkan would likely support legislation to repeal the EHT.

Deputy Mayor Fong also called Council President Bruce Harrell, indicating there was some interest in potentially repealing the EHT. Harrell told Deputy Mayor Fong he would discuss the matter with him after the weekend but did not want to discuss it on a Sunday. Deputy Mayor Fong also contacted Herbold, and they discussed procedural options for presenting potential repeal legislation.

Finally, Deputy Mayor Fong called council member Sally Bagshaw. Bagshaw, who was in Newport Beach, Oregon over the weekend, had not participated in the June 9th conference call with EMC Research. Deputy Mayor Fong told Bagshaw about the polling results and advised her that new legislation to repeal the EHT would be sent to the full council for public discussion. She was "dumbfounded" and communicated this reaction to Deputy Mayor Fong. Other than this call with Deputy Mayor Fong, Bagshaw had no contact with any council members that weekend and, therefore, did not discuss possible repeal legislation with any of them.

González testified she spoke with Deputy Mayor Ranganathan after returning from Washington, D.C. Deputy Mayor Ranganathan informed González that, in light of the poll results, Mayor Durkan was interested in promoting

legislation to repeal the EHT and wanted the City Council to join with her the following day, Monday, June 11, in announcing consideration of such legislation. Afterward, González called Herbold and told her about her conversation with Deputy Mayor Ranganathan. In turn, Herbold told González about calls she had had with both Mayor Durkan and Deputy Mayor Fong. González and Herbold both recognized that Mosqueda would likely not support a repeal of the EHT without a replacement plan.

Deputy Mayor Ranganathan also called council member Debora Juarez and told her that the four council members who had originally sponsored the EHT—Herbold, González, Mosqueda, and O'Brien—were considering a potential repeal.[2] Juarez testified this conversation was the first she heard of a potential repeal.

Both Deputy Mayor Fong and Deputy Mayor Ranganathan tried to connect with council member Rob Johnson, leaving voice mail messages and texts regarding the poll results. At 8:22 p.m., Deputy Mayor Ranganathan sent a text to Johnson in which she said, "Don't want to surprise you. EHT is DOA. Mayor wants to call for a repeal tomorrow am. We have been trying to reach folks yesterday and today to talk through. LG, MoB, LH, DJ, and SB are likely ready to move forward with a repeal and reset."[3] Johnson did not respond to this text.

---

[2] The record suggests this representation was not completely accurate. There is no indication in the record that Mosqueda ever supported repealing the EHT without a suitable replacement plan.

[3] One can infer that this text referred to council members Lorena González, Mike O'Brien, Lisa Herbold, Debora Juarez, and Sally Bagshaw. Although only Herbold testified that she had indicated support for repealing the EHT, a reasonable inference from this text message is that González, O'Brien, Juarez, and Bagshaw did as well.

Mosqueda, "under the impression that there was some kind of press release or some press event occurring that week about repealing the head tax," called Harrell the evening of June 10. Harrell told her he did not know anything about it and would figure out what was happening when he got in the office the next day. Finally, around 8:38 p.m., O'Brien, González, and Mosqueda arranged to meet at a coffee shop the following morning for "a 45 min huddle before going into work."

Meanwhile, Mayor Durkan's Communications Director, Stephanie Formas, was in Boston with Mayor Durkan for the U.S. Conference of Mayors. While flying home from Boston to Seattle on June 10, Formas prepared a draft press release relating to the possible repeal of the EHT. Formas's notes read:

> IDEAL HEADLINE: Mayor Durkan Leads Head Tax Repeal and Calls for a Reset; Seeking Consensus and More Collaboration to Address Homelessness, Mayor Calls on Council to Repeal EHT

She further wrote:

> "RESET"
> - A divisive referendum over the next five months is NOT how we move forward and tackle our urgent housing and homelessness crisis.
>
> . . . .
>
> - [Mayor Durkan has] been in discussions about how we can "reset."
>   - So this week, [Mayor Durkan] will be transmitting a bill to repeal the current head tax.

Formas also drafted a "Joint Statement w/ Councilmembers" that read in pertinent part:

> Statement by Mayor Durkan and Councilmembers XXX on the Future of the Business Tax to Address the Homelessness Crisis

> Seattle (June 11) – Seattle Mayor Jenny A. Durkan and a majority of the City Council including [TBD] released the following statement announcing a new bill (to be introduced today) to repeal the legislation establishing a tax on large businesses to address the homelessness and housing crisis:
>
> . . . .
>
> We heard you.  It is time to hit reset.  This week, instead of prolonging a fight, we are moving forward with legislation to repeal the current tax on large businesses to address the homelessness crisis – this bill has the support of a majority of the City Council.

(Emphasis omitted).  When Formas drafted that a "majority" supported repeal, she did not actually know if it was accurate.  These notes were, as she described them, just "ideas about a potential repeal."  She did not know if Mayor Durkan would issue the statement as drafted, or any statement for that matter, and did not know whether any council members would join the statement.  For this reason, she used the placeholders "TBD" and "XXX" in her draft.

   3.  Monday, June 11, 2018

González did not make the informal morning meeting she had scheduled with Mosqueda and O'Brien the previous evening.  But Mosqueda and O'Brien met around 8:30 a.m. to discuss the EHT polling results.  Mosqueda indicated a desire to work with community partners to run a campaign to oppose the anticipated EHT referendum.

When Harrell arrived at his office that morning, he asked his staff to reach out to the law department "so I could have some advice on what a repeal looks like."  He met alone with legal counsel around 9:00 a.m.  During this meeting, he learned what a repeal was and decided to schedule an executive session that morning for the full council to "gain the benefit of what I was just taught."  He then

informed several council members he intended to conduct an executive session that morning to discuss the issue of repealing the EHT.

At 9:09 a.m., City Central Staff Deputy Director Dan Eder e-mailed Harrell and O'Brien a proposed bill to repeal the EHT that had been drafted by Mayor Durkan's staff over the weekend. Eder indicated he intended to route the draft through the legal department, with the goal of walking the bill "onto today's Introduction & Referral Calendar." O'Brien testified that, shortly thereafter, he discussed procedures relating to the proposed legislation with Deputy Mayor Fong.

Meanwhile, Mosqueda met briefly with Herbold and González in her office at City Hall. They discussed their concerns about a potential repeal and the rumor Mosqueda had heard about a forthcoming press statement from Mayor Durkan's office.

At 9:30 a.m., the City Council held its regularly scheduled, open public briefing session, which included discussions of topics other than the EHT. As Mosqueda entered the briefing, Harrell told her he planned to hold an executive session that morning to discuss procedural issues concerning potential legislation regarding the EHT.

At the conclusion of the public session, Harrell took the council into executive session to discuss the mechanics of considering legislation to repeal the EHT. After concluding the executive session, Harrell approached each council member individually to ask if they objected to him scheduling a vote on the repeal legislation for the following day. He testified all of the council members agreed to this plan. Harrell issued a press release around noon on Monday, June 11,

announcing that he had scheduled a special meeting of the council, that he would be sponsoring legislation to repeal the EHT, and that he expected the council to vote on that proposed legislation during the special meeting.

At the same time, Mayor Durkan approved Formas's draft press release, and Formas hand-delivered a paper copy of it to Dana Robinson Slote, the City Council's Director of Communications. Because Robinson Slote's duties included coordinating the issuance of press releases, Formas asked her to determine which council members would be willing to join the statement. Formas then e-mailed Robinson Slote a copy of the draft release at 10:56 a.m., telling her to "[f]eel free to make edits." The version Formas delivered to Robinson Slote was identical to the version she had drafted on the plane the night before, including the "this bill has the support of a majority of the City Council" language. In addition, it still retained the "TBD" language because Formas still did not know which, if any, council members would join the statement.

In answers to written discovery, the council members indicated that Robinson Slote delivered hard copies of the press statement to all available council members or their aides with a request that they indicate whether they were willing to sign onto the statement. Johnson appears to have indicated his approval of the draft press release via text message at 9:58 a.m. According to Harrell, Robinson Slote showed him a version of the press release after he had scheduled the June 12 council meeting. He recalled agreeing to add his name to the statement.

A legislative aide working for González, Cody Reiter, maintained a tally sheet to record his understanding of which council members intended to join Mayor

Durkan's press release.  At approximately 11:18 a.m., he texted a copy of his tally sheet to an unidentified recipient:

At 11:26 a.m., Reiter texted the same recipient, "Dana [Robinson Slote] sending list of [co-signing] CMs to MO[4] in 4 min."  A minute later, the recipient responded, "I'm a yes."  González testified her aide prepared this tally sheet on the morning of June 11, but she did not direct him to do so.  Each of the other council members testified they learned of the tally sheet only after the June 12 vote and "did not see or know about that tally sheet at th[e] time [of deciding to join Mayor Durkan's press statement]."  One can reasonably infer from this testimony that Reiter's text at 11:18 a.m. was sent to González, and it was she who responded that she intended to join the press statement.

---

[4] At oral argument, the City Council indicated "MO" stood for Mayor's Office.

At 11:29 a.m., Robinson Slote made the following notes, indicating council members Herbold, Johnson, Harrell, O'Brien, González, and Bagshaw would join the press release, Jaurez's decision was unknown, and Mosqueda and Kshama Sawant would not join Mayor Durkan's statement:

FORMAS:
LH
RJ
BH
MO
LG
SB

PENDING:
DJ

NO:
TM
KS*

Although unclear, it appears Robinson Slote sent these notes to Formas.

At 11:57 a.m., Robinson Slote sent an e-mail to Formas confirming the list of names of council members who had assented to joining the press release.

**RE: For Review | Statement by Mayor Durkan and Members of the Seattle City Council on the Future of the Business Tax to Address the Homelessness Crisis**

| | |
|---|---|
| From: | "Robinson Slote, Dana" <"/o=exchangelabs/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=d02c050b2d79495397b6e97c030778e2-robinsd1"> |
| To: | "Formas, Stephanie" <stephanie.formas@seattle.gov> |
| Cc: | "Warner, Ian" <ian.warner@seattle.gov>, "Auriemma, Anthony" <anthony.auriemma@seattle.gov> |
| Date: | Mon, 11 Jun 2018 11:57:51 -0700 |

As requested, see below –

Council President Bruce A. Harrell
Councilmember Sally Bagshaw
Councilmember Lorena Gonzalez
Councilmember Lisa Herbold
Councilmember Rob Johnson
Councilmember Debora Juarez
Councilmember Mike O'Brien

Dana Robinson Slote
Director of Communication, Seattle City Council
O: 206.615.0061 | M: 206.423.3220 | L: 206.684.8566

The final press statement, issued at 12:38 p.m., read:

Seattle Mayor Jenny A. Durkan and members of the City Council, including President Bruce A. Harrell, Councilmember Sally Bagshaw, Councilmember Lorena González, Councilmember Lisa Herbold, Councilmember Rob Johnson, Councilmember Debora Juarez, and Councilmember Mike O'Brien released the following statement announcing the consideration of legislation to repeal a tax on large businesses to address the homelessness and housing crisis.

The third paragraph of the release read, "We heard you. This week, the City Council is moving forward with the consideration of legislation to repeal the current tax on large businesses to address the homelessness crisis."

The City's privilege log, generated in the course of discovery, showed that Robinson Slote and Formas communicated with attorneys within the law

department on June 11 regarding the content of the proposed press statement between 11:29 a.m.—when Robinson Slote was reasonably sure which council members would join the statement—and 12:34 p.m.—minutes before the issuance of the final press release. The privilege log suggests the attorneys recommended edits to the statement. Harrell testified that after approving an initial draft in the morning following the executive session, he was asked to read a second version, to which he said, "I'm fine with that too." One could reasonably infer from this evidence that, in fact, the attorneys recommended that Formas delete the phrase "this bill has the support of a majority of the City Council," as that language appears to have been deleted after the council members approved the statement but before it was publicly released.

The council members denied that there was any "formal polling of [c]ouncilmembers' positions regarding matters of official business." Each council member who approved the press statement testified that he or she did not discuss it with any other council member and did not understand or intend that the press statement indicated how they would vote on the proposed repeal legislation. Harrell testified he was careful not to talk to any council member about their input or opinion of the proposed press release because he knew "when a quorum of the council can agree on a major policy or a vote, outside of the public, in my mind, as an OPMA advocate, that can raise issues on the OPMA violation."

But by 4:27 p.m. on June 11, an e-mail between Mayor Durkan, Ryan Durkan, and others read, "Looks like Jenny has the votes to repeal head tax tomorrow."

- 13 -

4. <u>Tuesday, June 12, 2018</u>

The City Council conducted a public special meeting at 12:00 p.m. on June 12 to consider Council Bill 119280, a bill to repeal the EHT. After taking public comments, the bill passed with seven votes in favor—Bagshaw, González, Harrell, Herbold, Johnson, Juarez, and O'Brien—and two votes against—Mosqueda and Sawant. The seven council members who voted to repeal the EHT were the same seven who joined Mayor Durkan's press statement the day before.

C. <u>Procedural History</u>

West, acting pro se, sued[5] the City, the City Council, and the individual council members (collectively "City Council"), alleging the council members' communications between June 9 and June 12, 2018, regarding possible repeal of the EHT, constituted collective intent to transact official business outside of a public meeting, thereby violating the OPMA.

In cross motions for summary judgment, West argued, among other things, that the council members who signed the draft press statement, in which they agreed to the statement that "this bill has the support of a majority of the City Council," violated the OPMA. And the City Council argued the council members neither met nor conferred concerning the transaction of official business—i.e., repealing the EHT—prior to the June 12, 2018 public special meeting.

---

[5] The trial court consolidated West's case with <u>Egan v. City of Seattle</u>, Cause No. 18-2-14942-8 SEA. Egan and the City stipulated to dismiss Egan's claims.

The trial court denied West's motion and granted the City Council's motion for summary judgment, thereby dismissing West's claims with prejudice. West appeals.

ANALYSIS

West does not contend that a majority of the council members physically met to deliberate or discuss repealing the EHT. Instead, he argues that a quorum of the council decided to repeal the EHT through a series of meetings, phone calls, and electronic communications, as evidenced by the draft press release and Reiter's vote tally sheet.

We review summary judgment de novo, engaging in the same inquiry as the trial court. Torgerson v. One Lincoln Tower, LLC, 166 Wn.2d 510, 517, 210 P.3d 318 (2009); Lybbert v. Grant County, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. CR 56(c); Lybbert, 141 Wn.2d at 34. Mere allegations or conclusory statements of fact unsupported by evidence are not sufficient to establish a genuine issue of material fact. Baldwin v. Sisters of Providence in Wash., Inc., 112 Wn.2d 127, 132, 769 P.2d 298 (1989).

The OPMA provides, "All meetings of the governing body of a public agency shall be open and public and all persons shall be permitted to attend any meeting of the governing body of a public agency, except as otherwise provided in this chapter." RCW 42.30.030. Furthermore:

> No governing body of a public agency shall adopt any ordinance, resolution, rule, regulation, order, or directive, except in a meeting

open to the public and then only at a meeting, the date of which is fixed by law or rule, or at a meeting of which notice has been given according to the provisions of this chapter. Any action taken at meetings failing to comply with the provisions of this subsection shall be null and void.

RCW 42.30.060(1).

The OPMA defines "meeting" as "meetings at which action is taken." RCW 42.30.020(4). "[A] 'meeting' of a governing body occurs when a majority of its members gathers with the collective intent of transacting the governing body's business." Citizens All. for Prop. Rights Legal Fund v. San Juan County, 184 Wn.2d 428, 444, 359 P.3d 753 (2015). It is not a violation of the OPMA meeting requirements for a majority of the members of a governing body to gather for purposes other than a regular meeting or a special meeting as long as they take no "action" as that term is defined in the OPMA. RCW 42.30.070. The OPMA defines "action" as "the transaction of the official business of a public agency by a governing body including but not limited to receipt of public testimony, deliberations, discussions, considerations, reviews, evaluations, and final actions." RCW 42.30.020(3). A "final action" in turn is defined as including "a collective positive or negative decision." Id.

West contends city council members "met" serially between June 9 and June 11, 2018, in small groups or in one-on-one meetings, telephone calls, e-mails, and text messages, for the purpose of obtaining a collective commitment of a majority to vote in favor of repealing the EHT. To establish that this conduct constitutes an OPMA violation, West must show (1) a majority of the council "met" (2) with the collective intent to transact official business, (3) and during the

"meeting," the council members took "action" as defined by the OPMA—specifically, they discussed or deliberated on repealing the EHT. See Wood v. Battle Ground Sch. Dist., 107 Wn. App. 550, 564-65, 27 P.3d 1208 (2001).

In Wood, Division Two was asked to decide whether the exchange of e-mails among public officials can constitute a "meeting" under the OPMA. Id. at 564. In that case, school board members sent e-mails to each other discussing the potential termination of Wood, the school district's communications coordinator. Id. at 556. The court, in analyzing this issue, noted that Washington's OPMA was modeled on California's and Florida's open meeting laws. Id. at 560. Citing the California court of appeals decision in Stockton Newspapers, Inc. v. Members of the Redevelopment Agency, 171 Cal. App. 3d 95, 214 Cal. Rptr. 561 (1985), the court acknowledged that "[e]lected officials no longer conduct the public's business solely at in-person meetings." Wood, 107 Wn. App. at 562. And, it noted, courts have generally adopted a broad definition of "meeting" to effectuate open meeting laws. Id. at 562-63. In light of the OPMA's broad definition of "meeting," and the mandate to liberally construe the statute in favor of coverage, the court concluded that an exchange of e-mails can constitute a meeting. Id. at 564.

It further noted that the OPMA is not implicated if less than a majority "meet," or if members merely receive information on upcoming issues or communicate amongst themselves about matters unrelated to the body's business via e-mail. Id. at 565. But, the court concluded Wood presented evidence that a majority of the school board members e-mailed each other to discuss school board business

- 17 -

and that the members actively exchanged ideas and opinions, suggesting a collective intent to deliberate or discuss board business. Id. at 565-66. As a result, it concluded there were genuine issues of material fact as to whether these board members violated the OPMA. Id. at 566.

Later, in Citizens Alliance, the Supreme Court was asked whether a "meeting" of a governing body requires that a majority of that body be present "and under what circumstances a serialized sequence of phone calls and e-mails can constitute a 'meeting' under the OPMA." 184 Wn.2d at 438. The court, citing Wood, agreed that a "meeting" is any "gathering," the purpose of which is "to discuss or act on matters in which the attendees have a common interest." Citizens Alliance, 184 Wn.2d at 443 (internal quotation marks omitted) (quoting BLACK'S LAW DICTIONARY 1131 (10th ed. 2014)).

Citizens Alliance involved a citizens group (CAPR) that contended the San Juan County Council had violated the OPMA by passing four critical area ordinances after discussing these ordinances informally with a "critical areas ordinance team" (CAO Team). Id. at 434. The CAO Team consisted of county planning staff, the county prosecutor, consultants, and three council members—Fralick, Miller, and Pratt. Id. This CAO Team met 26 times over the course of a year and a half. Id. In April 2012, the county prosecutor submitted a memo to the council suggesting that all gatherings involving at least three council members should comply with the OPMA, after which the CAO Team held no further meetings. Id.

- 18 -

After the county council voted to adopt four critical area ordinances by a five-to-one vote, CAPR brought suit alleging that the three council members who participated in CAO Team meetings had violated the OPMA. Id. at 435. The court held that the CAO Team meetings did not violate the OPMA because only three of the six members ever attended any of these meetings. Id. at 445.

But CAPR also contended that "a serialized e-mail and telephone exchange" involving four council members constituted a private "meeting" in violation of the OPMA. Id. at 447. The alleged "serialized" communications consisted of two e-mails and a phone call exchanged over a 14-hour period. Id. One council member who did not participate in the CAO Team meetings, Peterson, sent an e-mail to two council members, Fralick and Miller, who were on the CAO Team. Id. In a response, Fralick referred to a telephone call he had with Pratt, the third CAO Team council member, referencing the CAO update. Id. Fralick copied Miller on this e-mail exchange. Id.

The Supreme Court held that these e-mails and the phone call did not constitute a "meeting" of the council because the communications "contain[ed] no indication that the participants had the requisite collective intent to meet." Id. It based this conclusion on the fact that there was no evidence Pratt was aware of the e-mails exchanged between Peterson, Fralick, and Miller, and no evidence Peterson or Miller was aware of the phone call Fralick had held with Pratt. Id.

Further, it described Miller as merely the passive recipient of one e-mail from Fralick and Peterson. Id. Citing Wood for the proposition that the passive receipt of e-mail does not constitute "participation" in a meeting, the court deemed

- 19 -

Miller's non-involvement to have reduced the possible meeting participants to only three, effectively precluding the existence of a quorum. Citizens Alliance, 184 Wn.2d at 448. It thus rejected CAPR's contention that there was any serialized meeting that violated the OPMA. Id.

Extending the reasoning of Citizens Alliance to this case, the in-person meetings, e-mails, phone calls, and text messages between and among the city council members could constitute a "meeting" under the OPMA if there was evidence that at least five members (a quorum) participated in and were aware that four others were participating in conversations about repealing the EHT. Under this test, none of the in-person meetings, phone calls, or text messages on June 9 or 10 constituted a "meeting" because there was no quorum participating in any of these communications, and no evidence that at least five members of the City Council were aware of any of the communications between individual council members or between the council members and members of Mayor Durkan's staff. Furthermore, in some of the calls, the individual council member was a mere passive recipient of information regarding the EMC Research poll results. These contacts and calls do not rise to the level of a "meeting."

But there is evidence that on June 11, 2018, after Harrell submitted a bill to repeal the EHT and scheduled a vote on that bill for the following day, seven council members signed on to a draft press release stating that the EHT repeal bill had "the support of a majority of the City Council." Each of the seven council members submitted a declaration in which they stated that they "did not discuss with any other [c]ouncilmember the substance of the statement (whether in draft

or final form)" and that by joining the June 11 press statement, they "did not understand or intend that doing so represented or indicated how [they] would vote with respect to proposed legislation." The text of what each was asked to review and approve, however, seems to express a very different sentiment:

> We heard you. It is time to hit reset. This week, instead of prolonging a fight, we are moving forward with legislation to repeal the current tax on large businesses to address the homelessness crisis – this bill has the support of a majority of the City Council.

(Emphasis added). There is certainly sufficient evidence to create a genuine issue of fact as to whether the council members' decision to approve this press release constituted a collective decision on the part of more than five members to vote to approve the EHT repeal legislation.

Notwithstanding this evidence, there is still the question of whether it violates the OPMA for a quorum of the city council to communicate to each other, in advance of a public meeting, how they intend to vote on a piece of proposed legislation. West relies on Stockton Newspapers for the proposition that engaging in "quorum-seeking" conduct in advance of a public vote violates the OPMA.

In that case, a newspaper alleged that the attorney for the San Joaquin Redevelopment Agency called each member of the agency one by one and conducted a telephonic poll to determine how they would vote on a proposed real estate transfer at an upcoming public meeting. 171 Cal. App. 3d at 103. The California appellate court concluded that if a quorum of the members of the agency "intended to unite in an agreement to agree," this vote-collecting through an intermediary would violate that state's open meetings law. Id.

The statutory provision on which <u>Stockton Newspapers</u> rests is different than Washington's OPMA:

> As used in this chapter, "action taken" means a collective decision made by a majority of the members of a legislative body, <u>a collective commitment or promise by a majority of the members of a legislative body to make a positive or a negative decision</u>, or an actual vote by a majority of the members of a legislative body when sitting as a body or entity, upon a motion, proposal, resolution, order or ordinance.

CAL. GOV. CODE § 54952.6 (emphasis added). California's open meetings statute thus prohibits a quorum of members of a local legislative body from participating in any informal process through which these members commit themselves "collectively to a particular future decision concerning public business." <u>Stockton Newspapers</u>, 171 Cal. App. 3d at 102.

Washington's OPMA differs textually:

> "Action" means the transaction of the official business of a public agency by a governing body including but not limited to receipt of public testimony, <u>deliberations</u>, <u>discussions</u>, considerations, reviews, evaluations, and final actions. "Final action" means <u>a collective positive or negative decision</u>, or an actual vote by a majority of the members of a governing body when sitting as a body or entity, upon a motion, proposal, resolution, order, or ordinance.

RCW 42.30.020(3) (emphasis added). Unlike California's law, our state statute does not explicitly include in its definition of "action" the concept of collectively committing or promising to make a particular positive or negative decision, the OPMA expansively defines "action" as including "deliberations" and "discussions" about prospective legislation. But given that the OPMA was modeled on California's open meeting law, we agree with West that the holding of <u>Stockton Newspapers</u> is consistent with the language and intent of Washington's OPMA.

We thus conclude if a quorum of a legislative body, such as the city council, collectively commits or promises to each other to vote—as a group—in favor of or in opposition to a piece of pending legislation at a future public meeting, then such a commitment may be evidence that a majority of the body attended a "meeting" with the collective intent to take an "action" in violation of the OPMA. There is sufficient evidence here from which a reasonable trier of fact could conclude that the seven members who agreed to join Mayor Durkan's press statement, indicating that the pending bill had the support of a majority of the council, were expressing their collective decision to vote to repeal the EHT outside of a public meeting.

The City Council relies on City of Seattle v. Kaseburg, 13 Wn. App. 2d 322, 467 P.3d 115, review denied, 191 Wn.2d 1013, 426 P.3d 748 (2018), to argue that such vote counting does not violate the OPMA. Kaseburg, however, is distinguishable. In that case, landowners succeeded in a quiet title action against King County, through which they acquired title to waterfront property in the northeast area of Seattle that had been used as a community beach for decades. Id. at 325-27. After the quiet title action, some community members asked the Seattle City Council to secure the property for community use through eminent domain. Id. at 326. In June 2015, at a council meeting open to the public, all of the council members discussed and signed a letter to the mayor expressing their support for acquisition of the property. Id. at 326-27. The City's Department of Parks and Recreation prepared an ordinance authorizing acquisition of the property through negotiation or condemnation. Id. at 327. Three months later, the

council voted to approve the ordinance, and the mayor signed the legislation. Id. at 328.

On appeal, the landowners contended, among other things, that the council violated the OPMA because "an open public hearing simply never occurred because the council members had pre-decided to condemn the [p]roperty before the public hearing on the [o]rdinance, as evidenced by the June 2015 letter to the mayor." Id. at 333. This court was not persuaded, concluding:

> [T]he council members signed the June 2015 letter to the mayor at a council meeting open to the public. That some or all of the council members may have "pre-decided" to sign the letter prior to the public meeting is of no moment. Similarly, the adoption of the [o]rdinance occurred at a meeting open to the public. The [landowners] have produced no evidence of any meeting between council members subject to the OPMA that was not open to the public.

Id. at 334.

In Kaseburg, council members expressed their support of a proposed eminent domain lawsuit by signing a letter during an open public meeting. After that meeting, legislation was drafted, and several months later, the council members adopted the legislation at another open meeting.

Here, unlike in Kaseburg, there is evidence to suggest that seven council members privately expressed to each other their collective intent to vote to repeal the EHT. If each individual council member "pre-decided," ahead of the June 12 public meeting, how they intended to vote, that fact would be insufficient to establish the collective intent to deliberate or discuss pending legislation. But if West can prove that, through their serial approval of a draft press release, they "pre-decided" how they intended to vote and then expressed that intent outside of

a public meeting to a sufficient number of council members to constitute a quorum, then a trier of fact could reasonably conclude a majority of the council "met" with the collective intent to transact official business—specifically, to discuss or deliberate on repealing the EHT.

In this case, there are genuine issues of fact as to whether the seven council members, by agreeing to join the draft press release, collectively committed to vote to repeal the EHT and, thereby, took "action" in violation of the OPMA. While the council members testified they intended only "to consider" repealing the EHT, and not to vote to do so, there is documentary evidence suggesting a contrary intention. It is an issue for the trier of fact to ultimately determine.

Reversed and remanded for further proceedings consistent with this opinion.

_Andrus, A.C.J._

WE CONCUR:

_Mann, C.J._

_Dwyer, J._